Filed 6/26/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SOFIA WILTON BARRIGA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>99 CENTS ONLY STORES LLC.,<br><br>    Defendant and Respondent. | E069288<br><br>(Super.Ct.No. RIC1308921)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Sharon J. Waters, Judge. Reversed with directions.

Boucher, Raymond P. Boucher, Maria L. Weitz, Neil M. Larsen; Law Offices of Sahag Majarian II and Sahag Majarian II for Plaintiff and Appellant.

Munger, Tolles & Olson, Malcolm A. Heinicke, Katherine M. Forster and Andrew C. Rubenstein for Defendant and Respondent.

# I.

## INTRODUCTION

Plaintiff Sofia Wilton Barriga filed this lawsuit against 99 Cents Only Stores LLC, (99 Cents) on her own behalf and on behalf of similarly situated current and former nonexempt employees of 99 Cents hired before October 1, 1999, and who worked the graveyard shift after January 1, 2012, until the conclusion of her lawsuit, pleading various Labor Code violations and violation of the unfair competition law. (Bus. & Prof. Code, § 17200 et seq.) Plaintiff alleged 99 Cents has a zero-tolerance policy that requires its stores to lock their doors at closing time, therefore, forcing nonexempt, nonmanagerial employees, who work the graveyard shift and clock out for their meal break or at the end of their shift, to wait for as long as 15 minutes for a manager with a key to let them out of the store. According to plaintiff, 99 Cents does not pay its employees for the time they have to wait be let out of the store, and its zero-tolerance policy denies employees their full half-hour meal break. In addition, plaintiff alleges 99 Cents does not promptly pay employees the wages they are owed upon termination or resignation and does not provide employees with accurate wage statements.

Plaintiff moved the trial court to certify two classes: (1) "Off the Clock Class," consisting of employees who were locked in the store and not paid for the time they waited, and (2) "Meal Period Class," comprised of employees who were denied full meal breaks because they were locked in. Thereafter, 99 Cents opposed plaintiff's motion to certify the proposed classes, contending there is no community of interests among putative class

2

members, and the lack of common issues among putative class members will render a class action unmanageable.  In support of its opposition, 99 Cents submitted 174 declarations from current and former nonexempt employees to establish, inter alia, that its closed-door policy was often observed in the breach, meaning graveyard shift employees could leave the store immediately without waiting to be let out, and those employees who did have to wait were let out promptly and paid for the time they waited.  Only 53 of the declarants were members of the proposed classes.  All 174 declarations included an identical or nearly identical paragraph stating the declarants knew their declarations could be used by 99 Cents to defend itself against a class action lawsuit about its wage policies and practices, and an identical or nearly identical paragraph purporting to state the declarants had not been coerced into signing their declaration and understood what they were signing.

Plaintiff deposed 12 of the employee declarants who were members of the proposed classes.  Most of the deponents clearly testified they understood what they were signing, and they did so freely and without coercion or promise of promotion or a pay raise.  However, some of the deponents testified they had no idea what the lawsuit was about or even why they had been called upon to testify.  And, most of the deponents testified they had been summoned, during working hours, to an office, by a representative from human resources, and presented with a declaration for their signature.

Plaintiff moved to strike all 174 declarations on the grounds the process by which they had been obtained was improper, and because they were substantively inconsistent with the subsequent deposition testimony of 12 of the declarants.  Concluding it lacked the

3

statutory authority to strike the declarations, the trial court denied plaintiff's motion to strike. In the alternative, the court concluded there was no coercion to justify striking the declarations from putative class members, and it lacked the authority to review for coercion let alone strike any of the declarations from *nonputative* class members. And, based on all 174 declarations, the court concluded plaintiff had not demonstrated a community of interests or a commonality of issues among putative class members. Therefore, the court denied plaintiff's class certification motion. Plaintiff appeals those orders.

Adopting the standards articulated in *Gulf Oil Co. v. Bernard* (1981) 452 U.S. 89 (*Gulf Oil*), California courts have recognized the trial court has both the duty and the authority to exercise control over precertification communications between the parties and putative class members to ensure fairness in class actions.[1] Moreover, the lower federal courts have consistently held that an ongoing business relationship between the class opponent and putative class members—especially a current employer-employee relationship—is rife for abuse and coercion. Therefore, those courts have cautioned that statements obtained by the class opponent from its employees, to oppose a class certification motion, must be carefully scrutinized for actual or threatened abuse. And, if the trial court concludes the statements were obtained under coercive or potentially abusive circumstances, it has discretion to either strike those statements entirely or discount the evidentiary weight to be given to them. In addition, some lower federal courts have

---

[1] See *Lofton v. Wells Fargo Home Mortgage* (2014) 230 Cal.App.4th 1050, 1067 (*Lofton*); *Howard Gunty Profit Sharing Plan v. Superior Court* (2001) 88 Cal.App.4th 572, 579 (*Howard Gunty*); *Parris v. Superior Court* (2003) 109 Cal.App.4th 285, 296 (*Parris*).

concluded the trial court's duty and authority to protect the integrity and fairness of actions extends to communications with a defendant's employees who are not currently or potentially members of the class.

The record demonstrates the trial court in this case was unaware of the need to scrutinize 99 Cents' declarations carefully and was either unaware of or misunderstood the scope of its discretion to either strike or discount the weight to be given the 174 declarations, including the declarations of employees who were not members of the putative classes, if it concluded they were obtained under coercive or abusive circumstances.  Therefore, we reverse the orders denying plaintiff's motion to strike 99 Cents' declarations and class certification motion, and we remand for the trial court to reconsider them.[2]

## II.

## FACTS AND PROCEDURAL HISTORY

*A.      Plaintiff's Complaint and Class Certification Motion.*

In her complaint for damages, plaintiff alleged she was employed by 99 Cents as a nonexempt worker from approximately 1997 until her termination on or about April 3,

---

[2] We express no opinion on whether the declarations were, in fact, obtained under coercive or abusive circumstances and express no opinion whether the trial court should or should not exercise its discretion to strike or discount the weight to be given the declarations.  In addition, we express no opinion whether the court should permit additional discovery to determine whether the declarations were freely and voluntarily given.  Finally, because we need not address the merits of the order denying plaintiff's class certification motion, we express no opinion as to the merits of the motion.

5

2013. According to plaintiff, 99 Cents' "policies and practices unlawfully require off-the-clock work. Defendants[3] have a policy of locking their retail stores during the graveyard shift while the stores are being stocked. As part of their policy and practice, Defendants also require employees who are leaving the store for a meal break or at the end of their shifts to clock out and then wait up to 15 minutes for a manager to inspect the premises and/or unlock the doors. Defendants do not compensate employees for the time they spend while waiting to be released from the premises, during which time they are subject to Defendants' control."

Plaintiff alleged 99 Cents acted in furtherance of policies and practices that denied her and the members of the proposed classes of: (1) compensation for all hours worked, in violation of Labor Code section 1194 and the Industrial Welfare Commission's wage order No. 7;[4] (2) half-hour off-duty meal breaks, in violation of Labor Code section 226.7 and wage order No. 7; (3) payment for wages earned in a timely manner upon termination or resignation, in violation of Labor Code sections 201 and 202; and (4) accurate wage statements, in violation of Labor Code section 226, subdivision (a). In addition, plaintiff alleged 99 Cents engaged in unlawful, deceptive, and/or unfair business practices in violation of Business and Professions Code section 17200 et seq.

---

[3] The only named defendant is 99 Cents.

[4] Wage orders adopted by the Industrial Welfare Commission govern wages, hours, and working conditions and "have the dignity and force of statutory law" unless superseded by statute. (*Stoetzl v. Department of Human Resources* (2019) 7 Cal.5th 718, 725.)

6

Plaintiff sought to bring her lawsuit on behalf of all similarly situated nonexempt employees of 99 Cents' California stores who worked the graveyard shift between the four years before she filed the lawsuit and the conclusion of the lawsuit. Plaintiff alleged (1) there was a well-defined community of interests in the lawsuit and the proposed class was easily ascertainable; (2) the class was estimated to be in excess of 1,000 individuals, so joinder of all affected class members was impractical; (3) the lawsuit involved common issues of law and fact regarding 99 Cents' "systematic course of illegal practices and policies throughout the State of California"; (4) plaintiff's individual claims were typical to the claims of class members; (5) plaintiff's counsel would provide fair and adequate representation to the classes; and (6) a class action was superior to individual lawsuits by members of the classes. Therefore, plaintiff prayed for an order certifying the lawsuit as a class action pursuant to Code of Civil Procedure section 382.

In her motion for class certification, plaintiff requested the trial court certify two opt-out classes: (1) "Off the Clock Class," which consisted of "All non-exempt, non-managerial employees of 99 Cents Only Stores retail store locations in the [S]tate of California who were hired any time before October 1, 1999, and who worked one or more shifts in a non-key holder position from January 1, 2012 through the date of final disposition of this action in which they clocked out to end their shift during overnight hours when the store was not open to the public"; and (2) "Meal Period Class," which consisted of "All non-exempt, non-managerial employees of 99 Cents Only Stores retail store locations in the [S]tate of California who were hired any time before October 1, 1999, and

7

who worked one or more shifts in a non-key holder position from January 1, 2012 through the date of final disposition of this action in which they clocked out for a meal period during overnight hours when the store was not open to the public."[5]

According to plaintiff, 99 Cents' "non-compromising" and "zero-tolerance" policy that the doors to all stores must be locked after closing resulted in all nonexempt, non-key holding employees working graveyard shifts and clocking out at the end of their shift, or clocking out for their meal break and wishing to leave the store, having to wait for as long as 15 minutes for a key-holding manager to let them out. Plaintiff argued 99 Cents does not pay those employees for the time they had to wait, and the zero-tolerance policy resulted in the denial of full half-hour meal breaks, in violation of California labor law. Plaintiff submitted deposition testimony and declarations from various current and former employees to support the allegations in the complaint and to establish the prerequisites for class certification.

B.      *Opposition to the Class Certification Motion.*

99 Cents opposed plaintiff's class certification motion. It contended its policies and practices were fully in compliance with California labor law and did not deny employees full compensation for wages earned or legally mandated meal breaks. It also argued the proposed classes should not be certified because individual issues predominate for members of both classes and manageability issues preclude certification. To refute the core

---

[5] Essentially, plaintiff sought certification of "Lock-In" classes. (See *Utne v. Home Depot U.S.A., Inc.* (N.D.Cal., Jul. 11, 2019, No. 16-cv-01854-RS) 2019 U.S. Dist. Lexis 115648.)

claim made in the complaint—that nonexempt, non-key holding employees were regularly locked in the stores and had to wait for a manager to let them out—99 Cents submitted declarations from 174 of its California employees, in which the declarants stated they were able to leave the store "immediately" or within one or two minutes upon clocking out of graveyard shifts and were not denied sufficient meal breaks. According to 99 Cents, only 53 of the declarants were members of the proposed classes.

All 174 declarations included an identical or nearly identical paragraph indicating the declarant understood his or her declaration could be used by 99 Cents to defend itself against a class action lawsuit "regarding the way the Company keeps track of the hours worked by employees whose shifts end when the store is closed for business, their meal breaks, and how it pays these employees' wages." One-hundred sixty of the declarations included an identical concluding paragraph which read: "I am signing this declaration voluntarily and understand that I am not required to do so. I understand that the Company representative who has helped me prepare this declaration is working on behalf [of] the Company and not me personally. I further understand that my decision to sign this declaration (or my decision not to do so) will have no effect whatsoever on my employment as a 99er, and the person presenting me with this declaration has made this clear."[6]

---

[6] Seven of the declarations had a slight variation on the last sentence: "In addition, I also understand that my decision to sign this declaration (or my decision not to do so) will not have any effect on my work as an individual of 99, and the person who presents this declaration has let me know this." In addition, seven of the declarations were in Spanish.

*C.*      *Plaintiff's Depositions of 12 of the 174 Declarants.*

As noted *ante*, only 53 of the declarations submitted by 99 Cents to oppose class certification were obtained from members of the putative classes. Plaintiff deposed 12 of them. During those depositions, plaintiff asked the declarants whether they truly understood the nature of the lawsuit and tried to probe whether the declarations were freely and voluntarily signed.

During the deposition of R.B., plaintiff's counsel stated, "We are only here to uncover the information that you know regarding this case." R.B. responded, "You said right now that I have knowledge about this case? I know nothing." When asked whether he had prepared for the deposition, R.B. testified, "I didn't even know what I was coming for." And when asked if he had reviewed any documents in preparation for his testimony, he said, "No. As I'm telling you I don't understand why I'm here." R.B. further testified, "three people arrived to my job and that's the paper I signed," referring to his declaration. When asked if he recognized his declaration, he replied, "Yes, but it's no use for you to give me papers because I don't understand anything." R.B. also testified he did not write the declaration himself and, when asked if someone prepared it for him, he testified three people spoke to him at his work, but only one of them spoke Spanish. The three people asked him questions for half an hour. He was not given a chance to review the declaration before he signed it. He said, "they asked me [to sign] so I didn't review anything, I just signed because they told me don't review anything." R.B. repeated his testimony that he knew nothing, and when asked why he decided to provide a declaration, he said, "Because

10

they asked me, they called me to talk. Because I wouldn't say anything on my own."
When asked if he had been given a Spanish version of the declaration to review, defense counsel objected the answer would require disclosure of privileged communications. R.B. added, "they told me what it means in Spanish." And, over the same objection, he testified the three people did not tell him who they represented.

J.D. testified people from human resources came to her workplace and called her into an office. They told her "somebody is suing," and gave her a declaration to sign. The company representatives spoke to her for 10 minutes. She read the declaration before she signed it. She testified, "He gave me the paper and I signed." When asked why she decided to provide a declaration, J.D. testified, "Because I am old, I [have been] working too long in 99 Cent Store, and I said whatever I saw. That's why, the truth." And when plaintiff's counsel asked if J.D. had been told she could have an attorney review the declaration before she signed it, defense counsel objected the question asked for disclosure of privileged communications and instructed J.D. not to answer.

M.B. testified that a woman from human resources came to her store and asked her questions. The woman translated a declaration for her, but she was not provided a Spanish version. M.B. had the opportunity to read the declaration before she signed it. When asked why she signed the declaration, M.B testified, "I replied only to what she asked me about my experience." She did not feel pressured to sign or believe there would be consequences if she did not sign the declaration, and she was not promised anything in exchange for her signature.

L.K. testified a woman from human resources came to her store and spoke to her in an office, after which the woman printed out a declaration to sign. L.K. signed the declaration after glancing over it, and she did not request that any changes be made to the declaration. She understood what the declaration said. She did not believe the woman from human resources was providing legal advice. When asked why she decided to provide a declaration, she testified, "I just didn't mind doing it." She had no motive for signing the declaration, she felt no pressure to do so, and she received no incentives afterward.

D.L. testified a representative from human resources contacted him at his store about signing a declaration. He said he reviewed and read the declaration before signing it, he understood what it said, and he did not request that any changes be made before he signed it. The representative spoke to D.L. in a closed office, and he was not asked any questions about his employment. When plaintiff's counsel asked if the representative told D.L. what the lawsuit was about, defense counsel instructed D.L. not to answer the question on the ground the answer would divulge the content of privileged communications. Defense counsel interposed the same objection when plaintiff's counsel asked if the representative had explained why he should sign the declaration, but D.L. answered, "No." And, defense counsel once again objected on the basis of privileged communications when D.L. was asked if the representative told him why his declaration was needed to win the lawsuit. D.L. felt no pressure to sign the declaration, he feared no consequences if he did not sign, and he was neither promised nor received anything in exchange for signing.

12

When asked if O.R. had prepared for his deposition, he testified, "I don't know what this lawsuit is about." He did not recognize his declaration, and when asked if he had seen it before, he said, "That's what a guy did for me, I think, about two months ago." He testified "a guy" showed up at his work and "gave it to me to sign." O.R. spoke to this person for 10 to 15 minutes. A coworker translated the declaration for him. O.R. did not ask that changes be made to the declaration before he signed it. When asked if he understood what he was signing, O.R. replied, "At moments I understood what I was explaining." When asked if the person who spoke to him had asked any questions about his employment or whether that person had told him what the lawsuit was about, defense counsel objected on privilege grounds and instructed O.R. not to answer. Defense counsel also objected when plaintiff's counsel asked O.R (1) if he had asked any questions about his declaration, (2) if the person had told O.R. why he was talking to him, (3) if the person had explained to O.R. why he should sign the declaration, and (4) if the person had told O.R. why his declaration was needed to win the lawsuit. O.R. testified he was not offered a Spanish version of the declaration. He "understood a little" of the translation of the declaration read to him by his coworker. When asked why he decided to provide the declaration, he said, "Well, he just asked me questions, and I was answering the questions." Finally, he testified he did not feel pressured into signing the declaration, and he was not promised a raise as an incentive to sign.

J.C. testified she recognized her declaration, but when asked, "What is this document?," she answered, "That I'm testifying here voluntarily. But doesn't this harm me

13

in any way?" J.C. did not remember if someone typed the declaration for her. When asked if she had been interviewed the day she signed the declaration, she answered, "Well, maybe, because my signature is there." J.C. further testified a woman interviewed her in an office at her store, but when plaintiff's counsel asked if the woman had said who she worked for, defense counsel objected on the grounds of privilege and instructed J.C. not to answer. J.C. answered anyway, saying, "I don't even remember what they told me." She said the interview lasted for half an hour or less. Defense counsel again objected on the grounds of privilege when J.C. was asked if she believed the woman who interviewed her was an attorney. She could not remember if the declaration was provided to her during the meeting. When the interview was completed, the woman said, "We're done," and J.C. signed the declaration. When asked if she read the declaration before signing it, J.C. replied, "That's why mistakes happen. Because you don't read." When asked again, she said, "Maybe I did. I signed it, so maybe I did." She gave essentially the same answer when asked if she understood what the declaration said.

Defense counsel once again objected on privilege grounds and instructed J.C. not to answer when plaintiff's counsel asked if she had requested the opportunity to have an attorney review the declaration before signing it, if she understood why she was asked to meet with the woman, and if she believed the woman was an attorney and providing her with legal advice. J.C. thought she was in trouble when she was called to the meeting, her heart was beating fast, and she was nervous and afraid during the meeting. When asked if she knew what the lawsuit was about, J.C answered, "Because of the time that they didn't

14

open the door right away, or what other reason?" When plaintiff's counsel asked J.C. what she believed the declaration was going to be used for, defense counsel once more objected on the grounds of privilege and instructed her not to answer. Although J.C. testified she did not feel pressured into signing, she once again said she was nervous during the meeting. When asked if she felt there would be consequences if she did not sign the declaration, J.C. answered, "Well, I thought so, but thank God nothing happened." Finally, when asked why she provided her declaration, she said she could not remember.

A man from human resources contacted J.B. at his store about providing a declaration. He did not know what the meeting was going to be about beforehand. The meeting lasted between 25 and 30 minutes, after which the man provided J.B. with the declaration for his signature. J.B. testified he read the declaration and understood what it said. He did not ask any questions about the declaration during the meeting. He did not think he was in trouble when he was called to the meeting. When plaintiff's counsel asked if the man identified himself as an attorney, if the man told J.B. what the lawsuit was about, if he told J.B. he was going to ask questions about the lawsuit, and if he explained why J.B. should sign the declaration and why the declaration was necessary, defense counsel objected on privilege grounds and instructed J.B. not to answer. J.B. testified he had no difficulty reading the declaration, he felt no pressure to sign it, and he was not promised anything in return for signing.

M.S. testified a woman named Carly approached her at her store and prepared a declaration for her signature. M.S. read and understood the declaration before signing it. She could not remember how long the meeting lasted. She did not believe Carly was her attorney, and she did not ask for the opportunity to have an attorney review the declaration before she signed it. When plaintiff's counsel asked if Carly (1) explained that she was an employee from human resources, (2) stated that she was an attorney, (3) explained what the lawsuit was about, (4) said why M.S. should sign the declaration, or (5) explained why the declaration was needed to win the lawsuit, defense counsel objected on privilege grounds and instructed M.S. not to answer. And when asked why she decided to sign the declaration, M.S. answered, "The thing is that I have been with the company for 20 years. She came to the office." She testified she felt no pressure to sign, she did not believe there would be consequences if she did not sign the declaration, and she was not promised a raise or a bonus in exchange for signing.

S.R. testified that a man, who she had never seen before, prepared a declaration for her signature. When asked if the man told her "who he worked for," defense counsel objected on privilege grounds. The meeting lasted about half an hour. She read and understood the declaration before signing it. Defense counsel again objected when S.R. was asked if she knew why she had been asked to the meeting, but S.R. answered, "Well, I guess I thought that it was something that it would have to be like a benefit for us as well." She did not believe she was in trouble when she was called into the meeting. And, when plaintiff's attorney asked if the man told S.R. what the lawsuit was about, if he said he had

16

questions for S.R. about the lawsuit, and if he explained why S.R. should sign the declaration and why the declaration was needed to defeat the lawsuit, defense counsel interposed the same privilege objections. S.R. testified she signed the declaration because she had nothing to hide, she felt no pressure to sign it, she did not believe there would be consequences if she did not sign, and she was not promised anything in exchange for her signature. She did not ask any questions about her declaration, and she did not request changes be made because she "understood it well."

M.G. testified a woman who claimed to be from human resources contacted her about preparing a declaration for her. When asked if the woman said what her job title was, defense counsel objected on privilege grounds. Counsel also objected on privilege grounds when M.G. was asked if the woman asked questions about M.G.'s employment, if she identified herself as an attorney, and if she said what the lawsuit was about. In any event, M.G. testified the woman did not explain what the lawsuit was about. M.G. testified she knew what the lawsuit was about, but when asked to explain her understanding of the lawsuit, she said, "Well, I don't know." The meeting lasted about 30 minutes. M.G. testified she read her declaration before signing it and understood what it said, but she also testified she only sometimes understands what she is reading in English. She did not ask that changes be made to the declaration before she signed it. When asked why she decided to provide a declaration, M.G. testified, "She called me." And when asked if the woman explained why M.G. should sign the declaration, defense counsel objected on privilege grounds and instructed her not to answer. Finally, M.G. testified she felt no pressure to

17

sign the declaration, she did not believe there would be negative consequences if she did not sign, and she was not promised anything to induce her to sign.

Finally, S.A. testified a declaration was presented for her signature. She reviewed it for about 30 minutes before signing it. She understood what it said, and she did not ask that changes be made. She did not feel pressured into signing the declaration, and she did not believe she would suffer any consequences if she refused to sign. She was not promised anything and received no raise or bonus for signing.

D.      *Plaintiff's Motion to Strike the Declarations.*

Plaintiff moved to strike all 174 declarations submitted in support of 99 Cents' opposition to the class certification motion, contending the "acquisition of such declarations was the result of a systematic use of coercive and deceptive meetings with declarants that exerted improper influence."[7] Inter alia, plaintiff argued the trial court had a duty and the authority to exercise control over precertification communications between the parties and putative class members to prevent abuse. Relying heavily on *Quezada v. Schneider Logistics Transloading & Distribution* (C.D.Cal., Mar. 25, 2013, No. CV 12-2188 CAS

---

[7] In addition, plaintiff interposed extensive evidentiary objections to statements made in the declarations.

(DTBx)) 2013 U.S. Dist. Lexis 47639 (*Quezada*),**8** plaintiff argued the trial court had the authority to strike the declarations submitted by 99 Cents because communications between a defendant opposed to class certification and its current employees who are putative class members is rife for abuse and coercion, and the deposition testimony discussed, *ante*, demonstrated the declarations were obtained under deceptive and coercive circumstances.**9**

In its opposition to the motion to strike, 99 Cents contended the motion was "a procedurally improper, 'Hail Mary' pass that cannot compensate for the weaknesses of [plaintiff's] bid for class certification." It argued plaintiff relied on "scraps of isolated evidence or isolated testimony" to show abuse, "while simply ignoring the mountain of contrary evidence." And, it contended the motion lacked merit because plaintiff "fail[ed] to cite a single authority that would justify striking declarations at the class certification

_____

**8** Unlike in the federal courts of appeals (see, e.g., U.S. Cir. Ct. Rules (9th Cir.), rules 36-1 to 36-5), in the federal district courts there is no formal provision to certify decisions for publication. District court orders that are included in reports such as the Federal Supplement are only "unofficially reported." (Cal. Style Manual (4th ed. 2000) § 1:34, p. 35; see generally Levin, *Making The Law: Unpublication in the District Courts* (2008) 53 Vill. L.Rev. 973.)

The prohibition on citing unpublished California decisions (Cal. Rules of Court, rule 8.1115(a)) does not apply to unpublished decisions from the lower federal courts. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 ["Citing unpublished federal opinions does not violate our rules."].) Like published decisions of the lower federal courts, unpublished decisions are not binding on us even on questions of federal law, but they are persuasive authority. (*Western Heritage Ins. Co. v. Frances Todd, Inc.* (2019) 33 Cal.App.5th 976, 989, fn. 6.)

**9** Among other things, plaintiff also argued the trial court should strike the declarations because 99 Cents' attorney strategically interposed countless, meritless objections on the ground of attorney-client privilege to prevent plaintiff from fully examining the witnesses to discover 99 Cents' improper influence over the declarants.

stage," and the deposition testimony submitted in support of the motion did not establish a pattern of abuse or coercion in the declaration-gathering process.

        E.       *Hearing and Rulings on Plaintiff's Motion to Strike and Class Certification Motion.*

In its tentative ruling, the trial court indicated it intended to deny plaintiff's motion to strike the declarations because it lacked statutory authority to do so and because plaintiff failed to show striking the declarations was warranted under *Quezada*. In addition, the court indicated it intended to deny plaintiff's evidentiary objections and class certification motion.

During the hearing on the motions, plaintiff argued this case was similar to *Quezada*, and the declarations should be stricken because they were gathered from employees who had been summoned to meetings, during work hours, without being told ahead of time what the meetings were about, and "the declarants were never formally instructed what the declarations were intended to be used for, or that they could be used against their own interest at a later point." Plaintiff argued some of the declarants who were deposed "indicated that they had no knowledge of what the purpose of the meetings were for, and that they really had no understanding that it was going to be used against their own interest and for purposes of opposing the certification or the attempted certification of the class itself." In addition, plaintiff argued the declarations were "presented to [the employees] to sign without having the opportunity to consider whether they wanted to attend the meetings or not. It was essentially required of them to do so while on the clock, . . . which would

20

indicate that they faced additional pressure to proceed with going along with an interview itself and also potentially agreeing to provide a declaration." According to plaintiff, "the totality of the situation itself would lead one to believe that if you are required to attend a meeting essentially while at work at the instruction of your manager, that it would essentially require you to go along with the situation and provide the declaration itself as a condition of your employment . . . ."

The trial court asked plaintiff's counsel, "Does *Quezada* apply to declarations from employees who are not putative class members?" Counsel replied, "I would infer that it does, Your Honor. From my understanding, it would." The court stated, "Part of what you indicated is they weren't advised that they were submitting declarations that might be used against them, or that it would be contrary to their interest. That, of course, would not apply to employees who are not potential members of the class." According to the court, "the best-case scenario for plaintiff would be to strike the declarations of those individuals who are putative class members. But I don't know that that substantially helps the plaintiff, because I understand 119 of the declarations are from nonclass members. So even if I struck the remaining 50 or so declarations, I'm still given a substantial . . . number of declarations that would be proper for the Court to consider." Counsel replied that, if the court were to strike the declarations of the putative class members, the remaining declarations "would not prove to be [of] substantial weight" to disprove the core allegations of the complaint.

99 Cents agreed with the trial court's tentative decision that it had "no statutory basis to strike the[] declarations," and argued "at the class certification stage the Court can consider all evidence and doesn't have to rule on admissibility." It agreed with the court's observations that, even if *Quezada* authorized the court to strike declarations from putative class members, it did not authorize striking the declarations of nonputative class members. In any event, 99 Cents argued *Quezada* was "totally factually different than the case we have here" because the declarants in this case were not misled about what they were asked to sign or about the nature of the lawsuit. 99 Cents argued the motion to strike "is just an effort to get the Court to disregard the evidence that is so clearly contradictory to their case and shows that individualized issues predominate this action. These declarations are very common in class certification motions. Both sides often introduce declarations."

While conceding "some language in the declarations" supported the position taken by counsel for 99 Cents that the declarants understood what they were signing, plaintiff argued "the testimony of the declarants themselves seem to contradict the language in the declarations at times, especially with respect to whether they had knowledge of the intent and purpose of the meetings and what the declarations will be used for . . . ."

After taking the motions under submission, the trial court denied plaintiff's motion to strike and the motion for class certification. In its order, the court concluded there was "no statutory authority" for the motion to strike. "To the extent" the court had the authority to strike declarations under *Quezada*, the court ruled plaintiff had not shown an order striking the declarations was warranted under the circumstances. As for the class

22

certification motion, the court ruled plaintiff "failed to present sufficient evidence that there are common issues of law or fact that predominate over the individual issues," "failed to show how liability will be established by common proof or a common theory of liability," and "failed to present a trial plan demonstrating that the individual issues, including consideration of Defendant's affirmative defenses, can be managed efficiently."

99 Cents submitted a proposed ruling denying plaintiff's motion to strike and class certification motion, which the trial court adopted. With respect to plaintiff's motion to strike, the ruling stated, "The Court notes as an initial matter that there is no statutory authority for Plaintiff's motion to strike. *This lack of authority is reason enough to deny Plaintiff's motion.*" (Italics added.) Addressing plaintiff's reliance on *Quezada*, the court concluded, "There is no indication that anything even approximating such coercive behavior occurred here. Defendant interviewed employees in store offices during business hours, but there is nothing inherently coercive about that setting (absent other factors suggesting coercion). Indeed, the declarants whom Plaintiff deposed testified that they never 'felt pressured to sign [a] declaration' and did not believe there would be any 'consequences' if they did not." "There is no reason to think that Defendant's declaration-gathering process was in any way improper. And even if there were such evidence, *Quezada* would not justify striking declarations of employees who are not prospective class members (121 of Defendant's 174 declarations)."

Plaintiff timely appealed.

### III.

### DISCUSSION

*A.     General Class Certification Principles and Standard of Review.*

"Originally creatures of equity, class actions have been statutorily embraced by the Legislature whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .' (Code Civ. Proc., § 382; [citations].)  Drawing on the language of Code of Civil Procedure section 382 and federal precedent, we have articulated clear requirements for the certification of a class.  The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  (Code Civ. Proc., § 382; [citations].)  'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

"In reviewing a class certification order, our inquiry is 'narrowly circumscribed.'" (*Noel v. Thrifty Payless*, *Inc.* (2019) 7 Cal.5th 955, 967 (*Noel*).)  "'"The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion:  'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group

24

action, they are afforded great discretion in granting or denying certification.' [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.'" [Citation.] 'Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal "'even though there may be substantial evidence to support the court's order.'"'" (*Noel*, at pp. 967-968, quoting *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436 (*Linder*).) "We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .'" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

B.     *This Court May Review the Interim Order Denying Plaintiff's Motion to Strike 99 Cents' Declarations.*

In its supplemental briefs and at oral argument, 99 Cents contended we should not address the order denying plaintiff's motion to strike because (1) plaintiff did not separately appeal it, and (2) plaintiff did not challenge the validity of the order in her main briefs. Our dissenting colleague agrees and criticizes us for addressing the merits of an unchallenged ruling. (Dis. opn. of Slough, J., *post*, at p. 1; see *id.*, at p. 14.)

True, plaintiff's notice of appeal only mentioned the order denying her motion for class certification. But, 99 Cents cites no authority for the proposition that the order denying plaintiff's motion to strike its declarations was separately appealable, and we have found none. Indeed, in its main brief, 99 Cents expressly argued that order was "*not directly appealable.*" (Italics added.)

25

There is no dispute that the order denying the class certification motion is appealable under the "death knell doctrine." (See, e.g., *Williams v. Impax Laboratories, Inc.* (2019) 41 Cal.App.5th 1060, 1066-1072.) We may also review the interim order denying the motion to strike because: (1) it is related to the merits of the order on appeal; (2) the decision on the motion to strike necessarily affects the order on appeal; and (3) the order denying the motion to strike necessarily affects plaintiff's substantial rights. (Code Civ. Proc., § 906; *Estate of Dayan* (2016) 5 Cal.App.5th 29, 38-39 [addressing prerequisites for review of nonappealable interim order]; *Lopez v. Brown* (2013) 217 Cal.App.4th 1114, 1130-1136 [same, in context of appeal from denial of class certification motion].) It does not matter that plaintiff did not expressly mention the interim order in her notice of appeal. (See *Mosley v. Pacific Specialty Ins. Co.* (May 26, 2020, E071287) ___ Cal.App.5th ___ [2020 Cal.App. Lexis 451, *5] ["Because the Mosleys appealed from a final judgment, we may review any nonappealable order encompassed within the judgment, such as the trial court's denial of the Mosleys' summary judgment motion, *even if not identified in the Mosleys' notice of appeal*." (Italics added.)].)

And, even if we were to conclude the order denying plaintiff's motion to strike was separately appealable, California Rules of Court, rule 8.100(a)(2), requires us to liberally construe plaintiff's notice of appeal to embrace that order because: (1) it was entered simultaneously on the same day and in the same written order as the denial of the class certification motion; (2) it is reasonably clear plaintiff also intended to appeal from that separate ruling; and (3) we perceive no prejudice to 99 Cents from doing so. (*In re J.F.*

26

(2019) 39 Cal.App.5th 70, 75-76 [in which this court addressed a reviewing courts' duty to liberally construe notices of appeal to embrace omitted orders or judgments]; see *Luz v. Lopes* (1960) 55 Cal.2d 54, 59.)

Finally, although plaintiff did not fully address the denial of the motion to strike in her main briefs, the rule that legal arguments made in the trial court but not addressed in an opening brief are forfeited is a discretionary one, and we may consider the merits of the arguments. (*Scott v. City of San Diego* (2019) 38 Cal.App.5th 228, 234, fn. 4 [exercising discretion to consider merits of argument not raised in opening brief]; City of *Oakland v. Hassey* (2008) 163 Cal.App.4th 1477, 1495, fn. 17 [same]; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2019) ¶ 9:21, p. 9-6 [discussing reviewing courts' discretion to disregard issues not properly addressed in opening brief].) Because we gave 99 Cents the opportunity to file supplemental briefs addressing that order, and it had the opportunity to address the merits of that order during oral argument, once again we perceive no prejudice.

*C.     The Trial Court Had the Duty and Authority to Exercise Control Over*

*Precertification Communications Between Parties and Putative Class Members, and It*

*Must Closely Scrutinize Declarations Filed in Opposition to Class Certification If They*

*Were Obtained Under Potentially Coercive Circumstances.*

On appeal, the parties generally agree the trial court had the duty and authority to exercise control over communications between the parties and potential class members to prevent unfairness.[10]

In addition, the parties agree in principle the trial court had the power to strike or discount the weight to be given to the declarations submitted in opposition to plaintiff's certification motion if the evidence demonstrated the declarations were obtained through coercion or deception.  The parties part company, however, on the question of the scrutiny to be given those declarations.

---

[10] We requested and received supplemental briefs from the parties addressing the trial court's authority and discretion under *Gulf Oil*, *supra*, 452 U.S. 89, and its progeny to strike 99 Cents' declarations and addressing whether the court in this case was aware of and understood the nature and scope of that discretion.

99 Cents transcribed the Internet webcast of oral argument conducted in this appeal and attached the transcript to its second supplemental brief.  This court does not officially transcribe oral argument, and we are aware of no authority that supports a party privately transcribing oral argument and filing a transcript with the court.  (See Eisenberg et al., Cal Practice Guide:  Civil Appeals and Writs, *supra*, ¶ 10:64.1, p. 10-18 ["Although most (but not all) appellate courts commonly make audio tapes of oral argument, none follow a policy of having written transcripts prepared."]; Ct. App., 4th App. Dist., Practices & Proc., Oral Argument ["The court does not transcribe oral arguments, however a recording is available."] available at <https://www.courts.ca.gov/2834.htm> [last viewed June 26, 2020].)  Therefore, we will ignore the transcript and quotations from the second supplemental brief.  (Cf. Eisenberg et al., at ¶ 9:170.2, p. 9-51 [reviewing court may ignore appendix to brief containing material that is not part of the record on appeal].)

Citing *Brinker*, *supra*, 53 Cal.4th 1004, and other published decisions in which the courts considered declarations from putative class members submitted to oppose class certification motions,[11] 99 Cents contends "California courts routinely consider employer-gathered declarations when determining whether class certification is appropriate, *even without close scrutiny of the declarations*." (Italics added.) But, the plaintiffs in those cases did not contend the court had the authority to strike or discount the weight to be given those declarations because they were obtained under coercive or abusive circumstances, so those courts had no occasion to decide whether the declarations should have been more closely scrutinized. "It is axiomatic that cases are not authority for propositions that are not considered." (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.)

As we explain, *post*, the trial court had the duty to carefully scrutinize 99 Cents' declarations for coercion or abuse. And, if the court found evidence that the declarations had been obtained through coercion or abuse, it had broad discretion to either strike some or all of the declarations or to discount the evidentiary weight to be given the declarations when deciding the class certification motion.

---

[11] Also cited by 99 Cents were: *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 339 (*Sav-On*), *Lampe v. Queen of the Valley Medical Center* (2018) 19 Cal.App.5th 832, 838, *Cruz v. Sun World Internat., LLC* (2015) 243 Cal.App.4th 367, 372 (*Cruz*), disapproved on another ground in *Noel*, *supra*, 7 Cal.5th at p. 986, fn. 15, *Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 974, *Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 982, and *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, 1351.

#### 1. *Gulf Oil.*

The extant California caselaw is silent on the nature and scope of the trial court's authority to strike or discount the weight to be given to declarations submitted in opposition to a class certification motion as a sanction for coercive or abusive conduct by the class opponent. Our Supreme Court has "repeatedly directed that in the absence of controlling state authority, California courts should utilize the procedures of rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.) to ensure fairness in the resolution of class action suits." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1118; accord, *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 318; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922; *Linder*, *supra*, 23 Cal.4th at p. 437; *Green v. Obledo* (1981) 29 Cal.3d 126, 145-146.)

Rule 23(d) of the Federal Rules of Civil Procedure (Rule 23(d)) provides that a federal district court hearing a class action lawsuit may issue orders that "impose conditions on the representative parties or on intervenors" and orders that "deal with similar procedural matters." (Rule 23(d)(1)(C), (d)(1)(E).) "The purpose of Rule 23(d) is to provide the district court with the means for facilitating 'the fair and efficient conduct of the action.'" (*County of Suffolk v. Long Island Lighting Co.* (2d Cir. 1990) 907 F.2d 1295, 1304, quoting 1966 Advisory Comm. com. to Rule 23(d).)

In *Gulf Oil*, *supra*, 452 U.S. 89, the United States Supreme Court considered a challenge to "a temporary order prohibiting all communications concerning the case from parties or their counsel to potential or actual class members." (*Id.* at p. 93.) The plaintiffs

30

argued the district court had exceeded its authority under rule 23 of the Federal Rules of Civil Procedure and violated their rights under the First Amendment to the United States Constitution. (*Id*. at p. 97.) Applying the doctrine of constitutional avoidance, the high court addressed the issue of the district court's authority under rule 23 first. "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules."[12] (*Id*. at p. 100.)

The high court stated it was beyond question that the district court's order interfered with the plaintiffs' ability to inform potential class members of the existence of the lawsuit and made it more difficult for plaintiffs "to obtain information about the merits of the case from persons they sought to represent." (*Gulf Oil*, *supra*, 452 U.S at p. 101.) "Because of these potential problems, an order limiting communications between parties and potential

---

[12] Although California courts have not considered the precise questions presented in this case, they have generally followed *Gulf Oil* in holding a trial court has the authority and duty to ensure fairness in class actions. "Once the trial court has identified a potential abuse, it 'has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel . . . .'" (*Howard Gunty*, *supra*, 88 Cal.App.4th at p. 579, quoting *Gulf Oil*, *supra*, 452 U.S. at p. 100.) "Precertification communication carries the potential for abuse. Thus, any 'order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.' (*Gulf Oil Co. v. Bernard*, *supra*, 452 U.S. at p. 101 . . . .) The court should identify the potential abuses and weigh them against the rights of the parties under the circumstances. (*Id*. at p. 102 . . . .)" (*Howard Gunty*, at p. 580; accord, *Lofton*, *supra*, 230 Cal.App.4th at p. 1067; *Parris*, *supra*, 109 Cal.App.4th at p. 296.)

31

class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing—identifying the potential abuses being addressed— should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances. As the court stated in *Coles v. Marsh*, 560 F.2d 186, 189 (CA3), cert. denied, 434 U.S. 985 (1977): [¶] '[T]o the extent that the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise the power without a specific record showing by the moving party of the particular abuses by which it is threatened. Moreover, the district court must find that the showing provides a satisfactory basis for relief and that the relief sought would be consistent with the policies of Rule 23 giving explicit consideration to the narrowest possible relief which would protect the respective parties.'" (*Gulf Oil*, at pp. 101-102, fns. omitted.)

The Supreme Court looked "in vain for any indication of a careful weighing of competing factors" and stated the district court had "failed to provide any record useful for appellate review." (*Gulf Oil, supra*, 452 U.S. at p. 102.) The court held the district court had abused its discretion because "[t]he record reveals no grounds on which the District Court could have determined that it was necessary or appropriate to impose this order." (*Id.* at p. 103.) Although the high court did not need to address the merits of plaintiffs'

32

constitutional challenge, or decide "what standards are mandated by the First Amendment in this kind of case," it noted the district court's order "involved serious restraints on expression" that should have "counsel[ed] caution on the part of a district court in drafting such an order," and should have focused the district court's "attention to whether the restraint [was] justified by a likelihood of serious abuses." (*Id*. at p. 104.)

As for the district court's authority under rule 23 of the Federal Rules of Civil Procedure, the high court once again recognized "the possibility of abuses in class-action litigation" and agreed with defendant "that such abuses may implicate communications with potential class members." (*Gulf Oil*, *supra*, 452 U.S. at p. 104.) However, the court made clear that "the mere possibility of abuses does not justify routine adoption of a communications ban that interferes with the formation of a class or the prosecution of a class action in accordance with the Rules." (*Ibid*.) The district court's broad prohibition on communication with potential class members was unjustified "in the absence of a clear record and specific findings of need." (*Ibid*.) Finally, the high court noted "[o]ther, less burdensome remedies may be appropriate. Indeed, in many cases there will be no problem requiring remedies at all." (*Ibid*., fn. omitted.)

### 2. *Gulf Oil's progeny.*

Since *Gulf Oil*, *supra*, 452 U.S. 89, the lower federal courts have held a district court hearing a class action has the duty and authority to exercise control over precertification communications between either side in the litigation and putative class members when those communications are coercive, may have the effect of chilling the rights of those

33

putative class members, and threaten to undermine the fairness and due process of class actions. (See *Rossini v. Ogilvy & Mather*, *Inc*. (2d Cir. 1986) 798 F.2d 590, 601 [affirming "order requiring prior court approval of virtually all oral and written communications between the parties and potential members of the class"].) Relevant here, the federal courts have recognized the potential for coercion when class opponents unilaterally communicate with potential class members with whom they have an ongoing business relationship. (E.g., *Kleiner v. First Nat'l Bank* (11th Cir. 1985) 751 F.2d 1193, 1202 ["A unilateral communications scheme . . . is rife with potential for coercion. '[I]f the class and the class opponent are involved in an ongoing business relationship, communications from the class opponent to the class may be coercive.'"]; *Sorrentino v. ASN Roosevelt Center*, *LLC* (E.D.N.Y. 2008) 584 F.Supp.2d 529, 533 [same].)

Courts are especially sensitive to possible coercion in unilateral communications between a class opponent and its current employees who are putative class members. (See, e.g., *Crosby v. Stage Stores*, *Inc*. (M.D.Tenn. 2019) 377 F.Supp.3d 882, 889 ["[T]he potential for coercion and abuse of the class action is especially high when there is an ongoing business relationship between the two parties, particularly when that relationship is one of employer to employee."]; *Camp v. Alexander* (N.D.Cal. 2014) 300 F.R.D. 617, 621 ["[A]n ongoing employer-employee relationship is particularly sensitive to coercion."]; *Giles v. St. Charles Health Systems*, *Inc*. (D.Or. 2013) 980 F.Supp.2d 1223, 1226 ["There is a 'heightened potential for coercion' where putative class members and the defendant are in an employer-employee relationship."]; *Urtubia v. B.A. Victory Corp*. (S.D.N.Y. 2012) 857

34

F.Supp.2d 476, 485 ["The Court finds that Defendants' workplace relationship with current employees, and their knowledge of sensitive information about current and former employees, put them in a position to exercise strong coercion in connection with potential class members' decisions regarding participation in this litigation."]; *Guifu Li v. A Perfect Day Franchise, Inc.* (N.D.Cal. 2010) 270 F.R.D. 509, 517 ["Courts have . . . recognized that in the context of an employer/worker relationship, there is a particularly acute risk of coercion and abuse when the employer solicits opt-outs from its workers."]; *Belt v. EmCare, Inc.* (E.D.Tex. 2003) 299 F.Supp.2d 664, 668 (*Belt*) ["As a letter sent from an employer to its employees, any statements in EmCare's letter have heightened potential for coercion because where the absent class member and the defendant are involved in an ongoing business relationship, such as employer-employee, any communications are more likely to be coercive."  (Fn. omitted.)].)

Indeed, some courts have concluded an ongoing employer-employee relationship between the class opponent and putative class members is *inherently* conducive to coercive influence.  (*Pacheco v. Aldeeb* (W.D.Tex. 2015) 127 F.Supp.3d 694, 698 ["'Speech between parties with an ongoing business relationship is inherently conducive to coercive influence, and an employer-employee relationship is a salient example of this type of ongoing business relationship.'"]; *Piekarshi v. Amedisys Illinois, LLC* (N.D.Ill. 2013) 4 F.Supp.3d 952, 955 ["[W]here there is an ongoing business or employment relationship between the class and the class opponent, communications may be inherently coercive."]; *Bublitz v. E.I. duPont de Nemours & Co.* (S.D.Iowa 2000) 196 F.R.D. 545, 548 ["Where

the defendant is the current employer of putative class members who are at-will employees, the risk of coercion is particularly high; indeed, there may in fact be some inherent coercion in such a situation."]; see 3 Newberg on Class Actions (5th ed. 2018) § 9:7.)

"When an 'ongoing business relationship, such as employer-employee exists,' courts review communications for coercion with heightened scrutiny." (*Patel v. 7-Eleven, Inc.* (D.Mass. 2018) 322 F.Supp.3d 244, 251.) Courts must be cognizant of the danger of coercion and exercise a healthy skepticism when assessing the evidentiary weight to be given to employee statements. "Common sense and prudence" instruct that affidavits from a defendant's current employees do little to rebut evidence in support of a plaintiff's claims "insofar as they were given under potentially coercive circumstances . . . ." (*Brown v. Nucor Corp.* (4th Cir. 2015) 785 F.3d 895, 913 (*Brown*).) "Of course, companies may investigate [the plaintiff's] allegations . . . and take statements from employees. But when it comes to assessing the probative value of those statements—when weighed against the numerous declarations of employees who took the often grave risk of accusing an employer of a workplace violation—courts should proceed with eyes open to the imbalance of power and competing interests." (*Id.* at p. 914; see *id.* at p. 913 [affirming district court's decision to give "limited weight" to approximately 80 declarations from current employees "given under potentially coercive circumstances"].)

Although the mere existence of a potentially or inherently coercive relationship is insufficient to support an order entirely striking employee declarations submitted in opposition to a class certification motion, or to support a finding severely discounting the

36

weight to be given those declarations (*Gulf Oil*, *supra*, 452 U.S. at p. 104), a compelling showing that the employees were misled or that the declarations were not freely and voluntarily given will suffice.  (E.g., *Longcrier v. HL-A Co.*, *Inc.* (S.D.Ala. 2008) 595 F.Supp.2d 1218, 1225-1230 (*Longcrier*) [striking 245 declarations from putative class members submitted in opposition to class certification motion based on "compelling showing" defendant engaged in deceptive and misleading practices when procuring the declarations].)

Finally, the district court's duty and authority to prevent abusive or coercive communications by the parties extends beyond statements obtained from current putative class members.  "The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard *generally* the administering of justice and the integrity of the class certification process."  (*O'Connor v. Uber Technologies*, *Inc.* (N.D.Cal., May 1, 2014, No. C-13-3826 EMC) 2014 U.S. Dist. Lexis 61066, *9 (*O'Connor*), italics added; accord, *Slaight v. Tata Consultancy Services*, *Ltd.* (N.D.Cal., Sept. 10, 2018, No. 15-cv-01696-YGR) 2018 U.S. Dist. Lexis 154127, *7 (*Slaight*); *McKee v. Audible*, *Inc.* (C.D.Cal., Apr. 6, 2018, No. CV 17-1941-GW(Ex)) 2018 U.S. Dist. Lexis 179978, *10 (*McKee*).)

In *O'Connor*, the class opponent, Uber Technologies, argued, "'Rule 23 provides no basis for "correcting" or restricting communications with persons who are not putative class members at the time of communication'" and, therefore, the court hearing a class action by

current Uber drivers had no authority to restrict the company's ability to issue arbitration agreements to people who had not yet used a smartphone application to drive for Uber. (*O'Connor*, *supra*, 2014 U.S. Dist. Lexis 61066 at p. *10.) The district court disagreed.

"As noted, Rule 23(d) grants a court 'broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties' so that it may ensure 'fair . . . conduct of the action' and 'protect the integrity of the class and the administration of justice.' [Citations.] The scope of the Court's authority—though certainly not unlimited, as *Gulf Oil* explains—is not confined by the wooden approach advocated by Uber. Such an approach ignores the broad purpose of Rule 23(d). [Citations.] Consistent with that purpose, the Supreme Court has recognized that a court's authority over communications under Rule 23(d) extends beyond 'actual class members' to 'potential class members' because 'the possibility of abuses in class-action litigation . . . may implicate communications with potential class members.'" (*O'Connor*, *supra*, 2014 U.S. Dist. Lexis 61066 at pp. *11-*12.) "The Court has authority to regulate communications which jeopardize the fairness of the litigation even if those communications are made to future and potential putative class members. To constrain the authority of the court under Rule 23(d) to regulating only communications between an employer and current class or putative class members, to the exclusion of future class members, would undermine the court's ability to insure the 'fair . . . conduct of the action,' and 'protect the integrity of the class and the administration of justice.' [Citations.] It would also undermine the court's ability to control communications which 'threaten to

38

influence the choice of remedies' in class actions. [Citation.] Under Uber's proposed rule, defendants could unilaterally limit the size and scope of the class to be certified without being subject to court supervision." (*O'Connor*, at pp. *13-*14.)

### 3. Quezada.

*Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639, on which plaintiff primarily relied for her motion to strike, arose from somewhat similar circumstances as this case. There, the defendant opposing class certification—Schneider Logistics Transloading & Distribution (SLTD)—obtained 106 declarations from its current employees "regarding the conduct alleged in the plaintiffs' complaint." (*Id*. at p. *2.) The declarations were obtained during interviews conducted by SLTD at its Mira Loma warehouses after the complaint was filed. (*Ibid*.) "These meetings were held in a man[a]ger's office during work hours, and the employees were ordered to report to these meetings either over a loudspeaker or by having a supervisor escort them to the meetings. Some employees did not understand why they were being summoned to the office, and were worried that the meeting was going to focus on discipline or an accusation of misconduct. One SLTD employee . . . asked his supervisor what the meeting was about, and was told that he 'would just have to go in and find out.'" (*Id*. at pp. *2-3, record citations omitted.)

Once the employees arrived at the office, lawyers for SLTD explained: "1. That the employee's participation in the meeting was voluntary, and that she or he could end their participation at any time and for any reason. [¶] 2. That the associate's participation in the drafting and signing of a declaration was completely voluntary. [¶] 3. That if the associate

39

decided to sign a declaration, she or he could make sure that it is truthful and accurate. [¶] 4. That SLTD cannot retaliate against the associate, or reward the associate, based on the information she or he provided in the meeting, or as a result of the employee's decision to participation, or not to participate, in the meeting. [¶] 5. That the employee was a potential member of a class of individuals on whose behalf a lawsuit has been brought against SLTD with claims pertaining to the subject matter discussed in the meeting, which included issues of unpaid wages. [¶] 6. That the lawyers present represented SLTD and not the employees. [¶] [and] 7. That the associate could consult with an attorney of her or his choosing if she had any questions about the process." (*Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639 at pp. *3-*4, fn. omitted.)

Before questioning the employees, SLTD's lawyers also told the employees "that the meetings were being conducted in connection with the SLTD lawyers' 'internal investigation about the conditions at the warehouse.' These statements led at least some SLTD employees to believe that their conversation was informal, and that it would be kept inside the company." (*Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639 at p. *5, record citations omitted.) The meetings lasted between 30 and 40 minutes, during which the lawyers focused their questions on the conduct alleged in the plaintiffs' complaint. (*Ibid.*) "At the end of the interviews, the employees were asked to sign a declaration. The SLTD lawyers did not, however, tell the employees that the document was a sworn declaration that could be used in plaintiffs' lawsuit to limit the employees' potential recovery. Instead, the employees were told that the document was a 'consent form' stating that the employee

40

had voluntarily agreed to be interviewed.  SLTD attorneys also stated that the only way an employee could receive a copy of the declaration was to sign it.  Some employees felt that they were being pressured into signing the declarations, and in total, only six employees declined to sign declarations." (*Id*. at pp. *5-*6, record citations omitted.)

Plaintiffs moved the district court for an order striking the declarations because they were obtained under coercive and unethical circumstances.  (*Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639 at p. *6.)  After acknowledging that defendants in class actions lawsuits are not barred from communicating with prospective class members before certification, the district court noted that "several decisions have recognized [that] a limitation on pre-certification communications is appropriate when misleading, coercive, or improper communications have taken place." (*Id*. at p. *10, citing *Maddock v. KB Homes*, *Inc*. (C.D.Cal. 2007) 248 F.R.D. 229, 236 & *Longcrier*, *supra*, 595 F.Supp.2d at p. 1227.)  The district court also noted other courts had recognized the heightened risk of coercion when a class opponent communicates with putative class members with whom the class opponent has an ongoing employer-employee relationship.  (*Quezada*, at p. *10, citing *Belt*, *supra*, 299 F.Supp.2d at p. 668 & *Mevorah v. Wells Fargo Home Mortgage* (N.D.Cal., Nov. 15, 2005, No. C 05-1175 MHP) 2005 U.S. Dist. Lexis 28615, *13.)  "In considering whether pre-certification communications between employers and employees are sufficiently deceptive or coercive to warrant relief, courts have considered several factors, including whether the employer adequately informed the employees about:  (1) the details underlying the lawsuit, (2) the nature and purpose of the communications, and (3) the fact that any

41

defense attorneys conducting the communications represent the employer and not the employee. [Citation.] Additionally, federal courts in California have found that any violation of California Rules of Professional Conduct 3-600 [addressing, inter alia, communications between counsel for a corporation and its employees] weighs in favor of finding that improper communications have taken place." (*Quezada*, at pp. *11-*12, citing *Longcrier*, at p. 1227, *Maddock*, at p. 237 & *Mevorah*, at pp. *4-*5.)

SLTD argued the interviews of its employees were not coercive or deceptive because the employees were told the attorney-interviewers represented the company, the employees were free to leave and to refuse to sign a declaration, and they were free to make changes to their declarations before signing. (*Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639 at pp. *12-*13.) The district court found that "[w]hile defendant has pointed to some evidence tending to show that no improper communications have occurred, . . . clear countervailing evidence shows that SLTD's communications with its employees were improper. Even if defendant provided its employees with some information about the lawsuit and with notice that the attorneys represented SLTD, the communications were deceptive because the interviewing attorneys failed to notify the employees of the nature and purpose of the communications. Crucially, the employees were never told that the purpose of the interviews was to gather evidence to be used against the employees in a lawsuit. In fact, the employees were not even told that the document they were asked to sign at the close of the interview was a sworn declaration, nor were they apprised of the significance of signing a declaration under penalty of perjury. The employees were instead

42

misleadingly told that the interviews were only an 'internal investigation.'" (*Id*. at pp. *13-*14, record citations omitted.)  "Failing to inform the employees of the evidence-gathering purpose of the interviews rendered the communications fundamentally misleading and deceptive because the employees were unaware that the interview was taking place in an adversarial context, and that the employees' statements could be used to limit their right to relief." (*Id*. at p. *14.)  The court also concluded the attorneys' communications with employees violated rule 3-600(D) of the California Rules of Professional Conduct.  (*Id*. at pp. *14-*15.)

The district court concluded the deceptive nature of the employee-interviews was enough to support a finding that improper communications had taken place, but the court also found the interviews were coercive, "which provides [an] additional reason to grant relief." (*Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639 at p. *16.)  "The interviews were conducted in a coercive manner because the employees did not attend the interviews on their own initiative, but instead were summoned into attendance over a loudspeaker or directly ordered to attend by their supervisors.  The employees were not given the option of simply not attending.  Defendant contends that the meetings were nonetheless not coercive because the employees were 'properly notified of the voluntary nature of the meeting[s].'  This notice was hardly sufficient, however, because the employees were ordered to attend the meetings, and it was therefore confusing and slightly self-contradictory for SLTD's lawyers to inform the employees that their presence at the interviews was voluntary.  Moreover, while defendant makes much of the fact that the employees were told they were

43

free to leave the interviews once they began, only five out of the nearly one-hundred and twenty employees interviewed actually chose to leave, which suggests that the interviewing attorney's grant of permission to leave did little to dispel the aura of coercion." (*Id*. at pp. *16-*17.) Finally, the district court ruled the way in which the interviews were conducted demonstrated they were coercive and the employees felt pressured into signing the declarations. The court quoted one employee as stating, "'The attorney said that I didn't have to sign the paper, but the way he said it and the way in which he forcefully put the paper in front of me made me feel like I had no choice but to sign the document.'" (*Id*. at p. *17.)

Based on its findings that the communications between SLTD and its employees were coercive and misleading, the court granted the plaintiffs' motion, ordered that any declarations obtained during the interviews would be disregarded entirely, ordered the issuance of a corrective notice to potential class members, and ordered SLTD to refrain from further communications with potential class members without prior court permission. (*Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639 at pp. *18-*19.)

4.     *Irvine v. Destination Wild Dunes Management*, *Inc.*

Although the procedural posture in *Irvine v. Destination Wild Dunes Management*, *Inc*. (D.S.C. 2015) 132 F.Supp.3d 705 (*Irvine*) differs from our case, it is nonetheless instructive. The plaintiff there moved the district court for an order striking declarations obtained by the defendants from putative class members during one-on-one meetings conducted before the court conditionally certified a class and an order prohibiting further ex

44

parte communications between defendants and putative class members. (*Id*. at p. 706.) "Based upon affidavits provided by three employees of Defendants who were then potential members of the putative class in this matter, employees were directed by a supervisory or human resources department employee of Defendants to report during work hours to a room to meet with defense counsel. When the employees appeared, they were told by defense counsel that the meeting was voluntary. The employees were then provided a written statement to sign which described the nature of the pending FLSA[13] litigation, disclosed that the employee may have an adverse interest to the Defendants and informed the employee that no retaliation would occur based upon their answers or willingness to participate." (*Irvine*, at p. 706, record citations omitted.)

The district court acknowledged the general rule that an employer and its attorneys are not prohibited from meeting with and communicating with putative class members after a lawsuit is filed but before the class is certified, so it concluded the defendants had not engaged in improper ex parte communications. (*Irvine*, *supra*, 132 F.Supp.3d at p. 706.) Moreover, because the district court had already granted the motion to conditionally certify the class, the court concluded the motion to limit further communication with putative class members was moot. (*Id*. at p. 707.) "The question remains what weight should be given to

_____

**13** In *Hoffmann-La Roche v. Sperling* (1989) 493 U.S. 165, 171-174, the United States Supreme Court held the principles established in *Gulf Oil* apply to collective actions under the FLSA (Fair Labor Standards Act of 1938) (29 U.S.C. § 201 et seq.). "*Hoffmann* was brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. However, since the ADEA incorporates § 16(b) of the FLSA into its enforcement scheme, the same rules govern judicial management of class actions under both statutes." (*Shaffer v. Farm Fresh*, *Inc*. (4th Cir. 1992) 966 F.2d 142, 147, fn. 5.)

45

the sworn declarations procured by defense counsel from the one-to-one meetings with putative class members prior to conditional class certification." (*Ibid*.) Following *Brown*, the district court recognized the need "to 'proceed with eyes open to the imbalance of power and competing interests'" when "assessing the probative value" to be given the employee declarations obtained under potentially coercive circumstances. (*Irvine*, at p. 707, quoting *Brown*, *supra*, 785 F.3d at pp. 913-914.)

"A review of the record before the Court suggests that while defense counsel appears to have made an effort to communicate orally and in writing to Defendants' employees that their participation and statements were entirely voluntary, the reality was that the employees received a direct order from supervisory or human resource personnel to appear during work hours while on the company's clock. The employees, who were low-paid and at-will under South Carolina law, were made aware that their employer had been sued, was fighting the suit and sought the help of employees in resisting the litigation. To accept Defendants' argument that the employees' statements were freely and voluntarily given without any hint of coercion, this Court would . . . 'have to pretend not to know as judges what we know as men.'" (*Irvine*, *supra*, 132 F.Supp.3d at p. 707.)

Because the employee declarations had been presented in opposition to the motion for conditional class certification, and that motion had already been granted, the district court ruled the motion to strike the declarations was technically moot. (*Irvine*, *supra*, 132 F.Supp.3d at p. 707.) However, the court severely limited the future use of the declarations. "Any future effort by Defendants to use the employee statements will be

evaluated by this Court under the standards established in *Brown v. Nucor Corp.* Further, in order that these statements not taint, in any way, the future discovery in this case, the parties are directed not to use the statements in the course of any depositions in this matter, including for purposes of impeachment of class members who may have signed such statements. Further, no party should attempt to use the statements at trial without the explicit authorization of the Court." (*Irvine*, at p. 707.)

D. *The Record Demonstrates the Trial Court Was Unaware of or Misunderstood Its Duty and Authority to Closely Scrutinize the Declarations Submitted in Opposition to Plaintiff's Class Certification Motion and to Strike or Discount the Weight to Be Given Those Declarations if the Court Found Evidence of Coercion or Abuse.*

In its supplemental brief, 99 Cents contends the trial court did, in fact, understand and properly exercise its discretion when it denied plaintiff's motion to strike. In addition, 99 Cents argues that, even if we conclude the court did not understand its discretion, we must affirm the order if there was any valid reason for it. Neither argument is persuasive.

Normally, we must presume the trial court was aware of and understood the scope of its authority and discretion under the applicable law. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 ["[W]e apply the general rule 'that a trial court is presumed to have been aware of and followed the applicable law.'"]; *McDermott Will & Emery, LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103 ["We presume the trial court knew and properly applied the law absent evidence to the contrary."]; *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 741 ["'It is a basic presumption indulged in by

47

reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties.'"].)  "This rule derives in part from the presumption of Evidence Code section 664 'that official duty has been regularly performed.'"  (*People v. Stowell*, at p. 1114.)  The rebuttable presumption under section 664 ""'affect[s] the burden of proof" (Evid. Code, § 660), meaning that the party against whom it operates . . . has "the burden of proof" as to the nonexistence of the presumed fact.  (Evid. Code, § 606 . . . .)'"  (*In re Raphael P.* (2002) 97 Cal.App.4th 716, 738.)

If the record demonstrates the trial court was unaware of its discretion or that it misunderstood the scope of its discretion under the applicable law, the presumption has been rebutted, and the order must be reversed.  (See *Noel*, *supra*, 7 Cal.5th at p. 968 ["[A]n order based upon improper criteria or incorrect assumptions calls for reversal '"even though there may be substantial evidence to support the court's order."'"].)  "'[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.'  [Citations.]  Therefore, a discretionary decision may be reversed if improper criteria were applied or incorrect legal assumptions were made.  [Citation.]  Alternatively stated, if a trial court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, it cannot be said the court has properly exercised its discretion under the law.  [Citations.]  Therefore, a discretionary order based on the application of improper criteria or incorrect legal assumptions is *not* an exercise of *informed* discretion and is subject to reversal even though there may be substantial

48

evidence to support that order. [Citations.] If the record affirmatively shows the trial court misunderstood the proper scope of its discretion, remand to the trial court is required to permit that court to exercise *informed* discretion with awareness of the full scope of its discretion and applicable law." (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15-16.)

Here, 99 Cents contends the record demonstrates the trial court properly understood and exercised its duty and discretion because "[t]he issues of coercion and abuse were squarely presented to the court and argued during the motion hearing, and the court's ruling carefully scrutinized the circumstances and content of the declarations." That the issues were briefed and argued does not demonstrate the court understood the scope of its duty and authority under *Gulf Oil* and its progeny. To the contrary, in its tentative ruling and order on submitted matters, the court concluded it lacked any "statutory authority" to strike the declarations. And, in its written ruling,[14] it ruled the lack of statutory authority "*is reason enough* to deny Plaintiff's motion." (Italics added.)

---

[14] 99 Cents contends the trial court's oral statements made during the April 20, 2017 hearing demonstrate the court engaged in an extensive analysis of coercion and did, in fact, understand the scope of its duty and discretion. But the court did not orally rule on the motion to strike from the bench. Instead, the court took the matter under submission and issued a one-page written order six days later. And on August 10, 2017, the court adopted the proposed ruling submitted by 99 Cents. It is those written orders that are on appeal, and "we may not use the court's oral statements to impeach its written order." (*Williams v. Superior Court* (2013) 221 Cal.App.4th 1353, 1361.) We may look to the court's analysis offered during the class certification hearing only to the extent it is consistent with the reasoning set forth in the court's final written order and sheds further light on the propriety of that reasoning. (See *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 726 [concluding trial court used improper criteria in denying class certification based on the court's "written order (as well as statements made at the motion hearing)"].)

Although the trial court did address *Quezada*, *supra*, 2013 U.S. Dist. Lexis 47639, in its written ruling and concluded the facts from that case were distinguishable, it is not entirely clear the court scrutinized the declarations from the perspective that communications between a class opponent and its current employees are fraught with potential abuse. For instance, the court stated, "There is no indication that anything even approximating such coercive behavior occurred here. Defendant interviewed employees in store offices during business hours, *but there is nothing inherently coercive about that setting* (absent other factors suggesting coercion)." (Italics added.) This ignores the fact that the declarants were summoned to the meetings and, as far as the record indicates, they were not told they could decline to be interviewed. Even if we were to disagree with the courts that have concluded a current employer-employee relationship between the class opponent and putative class members is *inherently* coercive, we cannot ignore the reality that such a relationship carries a heightened potential for coercion and abuse, and courts should be cognizant of the imbalance of power and interests when carefully reviewing employee statements. (See *Brown*, *supra*, 785 F.3d at p. 914; *Irvine*, *supra*, 132 F.Supp.3d at p. 707.)

Moreover, the trial court's statements during the hearing and its written ruling demonstrate it misunderstood the *scope* of its authority. The court stated, "*even if* there were such evidence [of coercion or abuse], *Quezada* would not justify striking declarations of employees who are not prospective class members (121 of Defendant's 174 declarations)." (Italics added.) Although most of the declarations came from employees who are not putative class members, and we assume those declarants are not potential

50

future class members either, we believe the court had the duty to scrutinize *all* the declarations and the authority to strike any of them if it found evidence of coercion or abuse. As noted, *ante*, the court's duty and authority are not limited to protecting putative class members from coercive or abusive communications from parties but extend more generally to ensuring the fairness and integrity of the class certification process. (*Slaight*, *supra*, 2018 U.S. Dist. Lexis 154127 at p. *7; *McKee*, *supra*, 2018 U.S. Dist. Lexis 179978 at p. *10; *O'Connor*, *supra*, 2014 U.S. Dist. Lexis 61066 at p. *9.)

The distinction drawn by the trial court and 99 Cents between declarations obtained from putative class members and those obtained from nonputative class members is not meaningful in this context. Although the potential for coercion and abuse might be more acute when a class opponent communicates with its employees who are putative class members, the imbalance of power in the employer-employee relationship exists for nonclass members as well. And the need to protect the fairness and integrity of the class certification process is no less important when the communications are directed at nonclass members. (Cf. *O'Connor*, *supra*, 2014 U.S. Dist. Lexis 61066 at p. *14.) If employee statements used to oppose class certification are obtained through coercion or abuse, the integrity and fairness of the certification process is undermined whether the statements come from putative class members or not. (*Ibid*.)

Citing *Cruz*, *supra*, 243 Cal.App.4th 367 and *Linder*, *supra*, 23 Cal.4th 429, 99 Cents argues that, even if we conclude the trial court misunderstood its discretion to strike the declarations, we must still affirm the order if there was any valid reason for

51

denying plaintiff's motion. In part, *Cruz* stated the standard of review in class certification appeals as thus: "'"Ordinarily, appellate review is not concerned with the trial court's reasoning but only with whether the result was correct or incorrect. [Citation.] But on appeal from the denial of class certification, we review the reasons given by the trial court for denial of class certification, and ignore any unexpressed grounds that might support denial. [Citation.] We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order. [Citation.]" [Citations.] Any valid, pertinent reason will be sufficient to uphold the trial court's order.'" (*Cruz*, at p. 373.) But, *Cruz* also stated, "'"A certification order generally will not be disturbed *unless* (1) it is unsupported by substantial evidence, (2) *it rests on improper criteria*, or (3) *it rests on erroneous legal assumptions*."'" (*Cruz*, at p. 373, italics added; accord, *Linder*, *supra*, 23 Cal.4th at p. 435.)

And as indicated, *ante*, our Supreme Court recently quoted the standard of review as articulated by *Linder*, which included the following: "'[A]n order based upon *improper criteria* or *incorrect assumptions* calls for reversal "'even though there may be substantial evidence to support the court's order.'"'" (*Noel*, *supra*, 7 Cal.5th at pp. 967-968, italics added, quoting *Linder*, *supra*, 23 Cal.4th at p. 436.) In other words, if an order denying a class certification motion is based on incorrect legal assumptions or a misunderstanding of

52

the applicable law, *there can be no valid reason for the order.*[15] (*Ayala v. Antelope Valley Newspapers, Inc*. (2014) 59 Cal.4th 522, 537 (*Ayala*) ["[W]hen the supporting reasoning reveals the court based its [class certification] decision on erroneous legal assumptions about the relevant questions, that decision cannot stand."]; *Brinker*, *supra*, 53 Cal.4th at p. 1050 ["A grant or denial of class certification that rests in part on an erroneous legal assumption is error; *without regard to whether such a certification* [*ruling*] *might on other grounds be proper, it cannot stand.*"  (Italics added.)].)

99 Cents and our dissenting colleague contend any error in the order denying the motion to strike was harmless.  (Dis. opn. of Slough, J., *post*, at pp. 1-2, 15, 25-31.)  But, as noted, the normal remedy in such a situation is to remand for the court to exercise informed discretion, *without deciding whether the error was harmless*.  (*F.T. v. L.J.*, *supra*, 194 Cal.App.4th at p. 16.)  For example, recently, a panel of this court reversed and remanded for the trial court to apply the correct legal standard and to reconsider a ruling.  (*City of Desert Hot Springs v. Valenti* (2019) 43 Cal.App.5th 788, 795 ["Because the trial

---

**15**  The language from *Cruz* quoted by 99 Cents—that a reviewing court cannot reverse simply because "*some* of the court's reasoning was faulty"—originates from the decision in *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830.  (*Cruz*, *supra*, 243 Cal.App.4th at p. 373, quoting *Thompson v. Automobile Club of California* (2013) 217 Cal.App.4th 719, 726 (*Thompson*), disapproved on another ground in *Noel*, *supra*, 7 Cal.5th at p. 986, fn. 15, in turn quoting *Kaldenbach*, at p. 726.)  *Kaldenbach* cited the decision in *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, for that proposition.  But, although *Caro* stated the general rule that a class certification order may be affirmed on any valid reason, it also stated, "Erroneous legal assumptions or improper criteria may require reversal 'even though there may be substantial evidence to support the court's order.'"  (*Id.* at pp. 655-656, quoted with approval by *Linder*, *supra*, 23 Cal.4th at p. 436.)

53

court applied an improper legal standard to the City's motion for appointment of a receiver by not addressing the two requirements expressly stated in the statute and instead addressing an issue the statute does not empower the court to decide, we conclude the court abused its discretion. [Citation.] Therefore, we reverse the judgment and remand for the trial court to reconsider the City's motion and determine whether the requirements of [the statute] have been satisfied."].) We did not first ask whether the error was harmless. And as noted, the Supreme Court has expressly stated a ruling on a class certification motion that rests on an erroneous legal assumption "cannot stand." (*Ayala*, *supra*, 59 Cal.4th at p. 537; *Brinker*, *supra*, 53 Cal.4th at p. 1050.) The court did not say such a ruling cannot stand *unless the error is harmless.* Until the court says otherwise, we are bound by that rule. (*Auto Equity Sales*, *Inc*. *v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In some circumstances, such as criminal sentencing, a reviewing court will not perform the idle act of remanding for the exercise of informed discretion when the record clearly demonstrates the trial court would have reached the same result had it properly understood the nature and scope of its discretion. (E.g., *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; see Civ. Code, § 3532 ["The law neither does nor requires idle acts."].) On this record, however, we cannot say with any certainty that the trial court would have denied the class certification motion had it properly understood its duty to carefully review *all 174 declarations* for potential abuse, not just the declarations from putative class members, and if it understood the scope of its discretion to strike or discount the weight to be given the declarations.

54

In sum, we conclude the record affirmatively demonstrates the trial court misunderstood its duty to carefully scrutinize the declarations submitted by 99 Cents in opposition to the class certification motion for coercion and abuse, and misunderstood the scope of its discretion to strike or discount the evidentiary weight to be given to those declarations if it found evidence of coercion and abuse.[16]  Therefore, we reverse and remand for the trial court to reconsider plaintiff's motion to strike and exercise its informed discretion.  (*F.T. v. L.J.*, *supra*, 194 Cal.App.4th at p. 16.)

---

[16]  Finally, 99 Cents also argues that, if there is any ambiguity in the record about whether the trial court misunderstood its duty or authority, we should not resolve the ambiguity against its order, and we should refrain from substituting our judgment about the weight to be given the declarations.  Because we conclude the record *affirmatively* demonstrates the court misunderstood the scope of its duty and discretion, we need not resolve any ambiguity in the record.

However, we agree that we may not reweigh the declarations.  (See *Sav-On*, *supra*, 34 Cal.4th at pp. 328, 334 [reviewing court may not reweigh evidence when class certification issue turns on disputed inferences drawn from the evidence]; *Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 918 [same].)  After exercising its duty to carefully review the declarations for coercion or abuse, the trial court shall determine in the first instance whether to exercise its discretion to strike any of the declarations and shall determine what weight to be given the declarations if the court declines to strike them.  To repeat, we express no opinion whether the evidence in the record demonstrates any of the declarations were obtained through coercion or abuse, about the appropriate remedy if the court finds coercion or abuse, or about the merits of plaintiff's class certification motion.

IV.

DISPOSITION

The orders denying plaintiff's motions to strike 99 Cents' declarations and denying plaintiff's motion for class certification are reversed.  On remand, the trial court shall reconsider plaintiff's motions consistent with the authorities discussed in this opinion. Plaintiff shall recover her costs on appeal.

CERTIFIED FOR PUBLICATION

McKINSTER
Acting P. J.

I concur:


CODRINGTON
J.

SLOUGH, J., Dissenting.

I'm not sure how we got to this point in the present appeal. The appellant Sofia Barriga asked us to review the trial court's order denying class certification in her "off-the-clock" employment lawsuit. When reviewing such an order, we must "afford[] great discretion" to the trial court and affirm if the order is supported by substantial evidence and valid reasoning. (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-437 (*Linder*).) But instead of reviewing the appealed certification order, the majority reach back to an *unchallenged* evidentiary ruling—the denial of Barriga's motion to strike defendant 99 Cents' employee declarations—and decide the trial court erred in making *that* ruling. Though Barriga didn't identify this evidentiary ruling as a basis for overturning the certification order, and though the majority express only doubt or puzzlement about whether the ruling affected the trial court's certification decision, they nevertheless reverse the evidentiary ruling *and* the order denying certification, and remand for the trial court to reconsider the evidentiary ruling and then figure out for itself whether that makes any difference to its certification decision.

In other words, they treat the error in the evidentiary ruling as reversible per se and refuse to determine whether it prejudiced the outcome of this case. Indeed, the majority admit they're not sure whether the error affected the certification decision. (Maj. opn., *ante*, at p. 54 ["we cannot say with any certainty that the trial court would have denied the class certification motion had it properly understood . . . the scope of its discretion to

1

strike or discount the weight to be given the declarations"].) Our state's Constitution, our Evidence Code, and our Code of Civil Procedure require us to determine whether evidentiary errors are prejudicial. (Cal. Const., art. VI, § 13; Evid. Code, § 353; Code Civ. Proc., § 475.) For that reason, *no court has ever overturned a certification order based on an evidentiary ruling without determining whether the ruling affected the order.* This is a first. *Every* court that has found an abuse of discretion in an evidentiary ruling has gone on to determine whether the error was prejudicial to the trial court's certification decision.

As the court explained in *ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277 (*ABM Industries*), "Should we determine in this case that an abuse of discretion has occurred, *that conclusion alone is not sufficient to support reversal of the trial court's certification decision.* Rather, the 'judgment of the trial court may not be reversed on the basis of the *erroneous admission of evidence, unless that error was prejudicial.*'" (*Id.* at p. 293, italics added.) As I will elaborate below, *ABM Industries* is not an outlier, but the rule.

The majority's approach is not only wrong on the law, it's wasteful and unnecessary in the present litigation. And, pursued as a practice in class litigation generally, as the majority proposes, it would be disastrous. Their approach isn't modest; it announces an entirely new standard of review for certification orders, which they claim is mandated by our Supreme Court. (Maj. opn., *ante*, at p. 54.) The majority say they're following the standard articulated in cases like *Linder* or *Ayala v. Antelope Valley*

2

*Newspapers, Inc.* (2014) 59 Cal.4th 522 (*Ayala*), which require reversal of a certification order if it was *based on* improper legal criteria. But that standard doesn't apply here because the majority aren't reviewing the certification order, *they're reviewing an evidentiary ruling*.

In any event, even the standard for reviewing certification orders requires the majority to perform a prejudice analysis—it's written into the rule. As our Supreme Court has explained time and again, the error or improper legal criteria must be a *basis* for the trial court's certification decision to require reversal. (See *Linder*, *supra*, 23 Cal.4th at p. 436 ["Under this standard, [a certification] order based upon improper criteria or incorrect assumptions calls for reversal"].) "A certification decision is reviewed for abuse of discretion, but when the *supporting reasoning* reveals the court *based its decision* on erroneous legal assumptions about the relevant questions, that decision cannot stand." (*Ayala*, at p. 537, italics added.) That means, before we can even decide whether a certification order is based on erroneous legal assumptions, "we must [first] examine the trial court's *reasons* for denying class certification." (*Linder*, at p. 436, italics added.) Reversal is appropriate only if the error actually affected the trial court's decision on whether to certify the class.

Simply put, there is no way to determine whether reversal is proper here *without reviewing the trial court's reasons for denying certification*. But that is precisely what the majority refuse to do. They not only omit any discussion of the basis for the trial court's certification order, they outright refuse to review the certification order at all. (Maj. opn.,

*ante*, at p. 5, fn. 2 ["we need not address the merits of the order denying plaintiff's class certification motion [and] we express no opinion as to [its] merits"].) Indeed, they claim our Supreme Court's *Ayala* decision doesn't *allow* them to consider whether the purported abuse of discretion was harmless. (Maj. opn., *ante*, at p. 54.)

The implications of the majority opinion are staggering. By treating error on a discretionary evidentiary ruling as reversible per se, the majority read the prejudice requirement out of our Supreme Court precedent (and our Evidence Code and our Code of Civil Procedure and our Constitution). Under today's holding, a party challenging a certification order can ask the appellate court to review every evidentiary ruling made leading up to the order (or the appellate court can conduct this review sua sponte as my colleagues have done here) and, if the appellate court finds any error, it *must* send the case back to the trial court to start over from the place of the interim ruling. Do not pass Go. Do not collect $200. Why? According to the majority's interpretation of *Ayala*, it's because there was an erroneous ruling *in addition to* an order on certification—no nexus between the two is required. This is a fundamental misunderstanding of our role as an appellate court and threatens to make class action litigation take even longer and cost even more than it already does.

To make matters worse, the majority reach their result only by misinterpreting the trial court's clear ruling. I cannot overstate how deeply I disagree with their treatment of this case. I therefore respectfully dissent.

Because the error is so significant, I will explain my objections at length. In the first part of my opinion, I explain why I would affirm the ruling actually appealed—the denial of class certification. In the second, I identify the factual and legal errors in the majority opinion and explain why remand is futile and will cause an unfortunate waste of judicial and litigant resources.

## I

## THE COURT PROPERLY DENIED CERTIFICATION

### A. *Background Facts*

Respondent 99 Cents is a California-based retail company that operates over 280 stores throughout the state. One of their companywide policies requires store doors to remain locked during nonbusiness, late night and early morning hours. The purpose of this nighttime security policy is to prevent theft and protect employees working graveyard shifts from robbery. Barriga's lawsuit claims the policy has caused her and other graveyard shift employees to spend unpaid, off-the-clock time on the job. She alleges they routinely must wait several minutes after their shifts have ended for a manager (or other key-holding employee) to unlock the store doors so they can leave.

Barriga sought to certify two classes of employees—those who clocked out to end a shift during graveyard hours and those who clocked out for a meal period during graveyard hours. The trial court concluded certification was inappropriate for two independent reasons. First, it concluded individualized issues would predominate the liability determination, that is, whether and how long graveyard shift employees had to

5

wait after their shift ended to be let out of the store. It found that 99 Cents' nighttime security policy did not necessarily result in off-the-clock waiting (as Barriga argued) but rather the task of determining whether employees had to wait after their shift to leave depended on the individual operations and layout of each retail store. Second, the court concluded Barriga had failed to present a manageable trial plan for the liability phase. She proposed to prove the claims based solely on her own testimony and 99 Cents' policies. The trial court concluded this plan would not permit the manageable resolution of liability because ascertaining whether employees in each store had in fact been required to wait would necessitate "mini-trials involving store-specific, shift-specific, [and] manager-specific evidence."

B. *Standard of Review*

The plaintiff advocating class treatment "bears the burden of establishing that the requisites for such treatment are present." (*Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 764.) Relevant here, this includes demonstrating that issues of law or fact common to the class "predominate" over individualized issues. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28-29.) A trial court ruling on a certification motion determines "'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326

6

(*Sav-On*).) "[T]he focus in a certification dispute is on what type of questions—common or individual—are likely to arise in the action." (*Id*. at p. 327.)

"'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.'" (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) This is why, "[o]n review of a class certification order, an appellate court's inquiry is narrowly circumscribed" and we must "'[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record.'" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022 (*Brinker*).) "'The decision to certify a class rests squarely within the discretion of the trial court'" and is therefore reversed only for "'*manifest* abuse of discretion.'" (*Ibid.*, italics added.) We will affirm a certification order unless it's contrary to the evidence or is "based upon improper criteria or incorrect assumptions." (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 968.)

C.    *Analysis*

To support certification, Barriga argued 99 Cents' nighttime security policy is "non-compromising" and "necessarily require[s]" off-the-clock waiting. She claimed the only aspect of the case that raised individualized questions was damages, that is, *how long* each employee had to wait to exit. She claimed the threshold liability question of *whether* employees had to wait in the first place could be answered by simple, common proof—namely, 99 Cents' policies and her own testimony.

7

To oppose certification, 99 Cents submitted the deposition testimony of its corporate representative, Barriga, and several other employees. The deposition testimony showed that exit procedures differ from store to store, resulting in various ways for graveyard shift employees to leave the store immediately. The testimony showed that in some stores, multiple employees have door keys so employees don't have to spend time trying to find someone to let them out. In other stores, the managers know when employees are clocking out and meet them at the door when it's time to leave. In others, the staff clocks out and leaves together. And in still others, management leave certain doors open during the graveyard shift for operational purposes like cleaning and loading.

In a written ruling, the trial court considered and rejected Barriga's argument that her testimony and 99 Cents' policies could serve as common proof of employee detention. The court noted that the company maintained a strict timekeeping policy requiring nonexempt employees to accurately record "all time worked." The policy tells employees to "[c]lock in when you arrive, clock out when you leave and do not perform work at any time that is not accurately reflected on your time record." It also says that all employers "are responsible for the proper and accurate recording of their time worked," and "may not work 'Off the clock' for any amount of time (under any circumstances)." The court also noted that 99 Cents' meal period policy requires all employees to stop all work during meal periods.

The court also found that the company's nighttime security policy did not necessarily require or result in off-the-clock waiting. Citing the deposition testimony

8

discussed above regarding the different operations at each store, the court instead found that "the record supports a long list of reasons why employees would be able to exit immediately after clocking out, even if doors *were* generally locked at night. [¶] . . . [¶] These practices do not require deviations from the store security policy. [Record Citation.] To the contrary, they are facially (and intuitively) consistent with the policy, even if the requirement to lock doors at night is 'non-compromising' or 'zero tolerance.'" The court found additional individualized issues weighing against certification, noting that "even if managers took some time to unlock doors, the evidence shows that employees often chose to stay inside stores for breaks voluntarily, rather than venturing outside in the middle of the night" and that "employees are instructed to contact management or human resources to 'fix' their time punches if they ever 'feel [they] have worked any time and not been paid for it.'" In sum, the court concluded the evidence showed that whether an employee had to wait to exit the store after clocking out depended on a multiplicity of individualized factors, such as the number of key-holding employees on duty during a given shift in a given store, the scheduling of breaks, the communication between managers and employees, and the layout and practices of each store.

The trial court also addressed the cases Barriga relied on to support certification and found them distinguishable. The court noted they were all "bag check" cases in which the employer had a policy requiring all employees submit to a search of their bags after clocking out but before leaving. Whereas 99 Cents' nighttime security policy "does

9

not in itself prove that there was waiting time," there was no question in the bag check cases that employees had to wait for some period of time before leaving "based solely on the fact that the employer required an 'off the clock' security check."

The trial court instead found the circumstances of this case analogous to *Stiller v. Costco Wholesale Corp.* (S.D.Cal. 2014) 298 F.R.D. 611 (*Stiller*) and *Holak v. Kmart Corp.* (E.D.Cal., June 6, 2014, No. 1:12-cv-00304 AWI) 2014 WL 2565902 (*Holak*), two off-the-clock cases where the courts denied certification based on their determination that individualized issues would predominate trial. In *Stiller*, the plaintiffs alleged that "a combination of Costco's closing, payroll, and timecard policies . . . resulted in a de facto companywide policy of locking employees in warehouses during closing lockdown procedures without pay." (*Stiller*, at p. 615, affd. (9th Cir. 2017) 673 Fed.Appx. 783.) The district court denied certification because the common closing policies "answer[ed] only] the question of whether employees were *sometimes* detained without pay" and determining whether each class member had been required to work off the clock (i.e., determining liability) would require individualized review. (*Stiller*, at pp. 624-625, 629-630.)

In *Holak*, the employer's policy required store managers to lock store doors at night, "preventing customers [and criminals] from entering and employees from leaving." (*Holak, supra*, 2014 WL 2565902, at p. *16.) As in *Stiller*, the trial court denied certification because the plaintiff had not identified any express policy requiring that store "managers keep employees in the store after they clocked out of their shift" and the

10

locked door policy could at best show that some employees might have been required to remain in stores some of the time, *depending on managers' individual practices*. (*Holak*, at p. \*7.) The trial court found Barriga's lawsuit "virtually indistinguishable from *Stiller* and *Holak*" because like in those cases, Barriga's evidence "shows at most that employees were *sometimes* detained without pay" but "does not show . . . that employees were *uniformly* or *commonly* detained without pay." (Some italics added.)

I agree with the trial court's assessment of Barriga's lawsuit. The bag check cases she relied on are inapposite because they involve policies that necessarily result in off-the-clock waiting. Here, in contrast, any waiting that occurs is not the result of a uniform policy but of how each individual store is designed and operates. As a result, this case is analogous to *Stiller* and *Holak*—and many other off-the-clock cases—where the challenged policy was facially valid and did not necessarily result in off-the-clock waiting. (See also *Brinker*, *supra*, 53 Cal.4th at p. 1052 [individual issues would predominate off-the-clock class because, in the absence of "a uniform, companywide policy, proof of off-the-clock liability would have had to continue in an employee-by-employee fashion, demonstrating who worked off-the-clock, how long they worked, and whether [the employer] knew or should have known of their work"]; *Cruz v. Sun World Internat., LLC* (2015) 243 Cal.App.4th 367, 388 [denial of certification proper because plaintiff presented "no evidence that defendant had a uniform policy or practice that violated the law and that affected [more than a handful of] employees"]; *Koval v. Pacific Bell Telephone Co.* (2014) 232 Cal.App.4th 1050, 1062 [denying certification where the

relevant policy was not implemented uniformly and therefore determining liability would require "a shifting kaleidoscope of liability determinations" regarding different manager's practices during different shifts at different times]; *Koike v. Starbucks Corp.* (9th Cir. 2010) 378 Fed.Appx. 659, 661 [affirming denial of certification because the "evidence tends to show only that business pressures exist which *might* lead assistant managers to work off-the-clock [but] . . . individualized factual determinations are required to determine whether class members did in fact engage in off-the-clock work"]; *In re AutoZone, Inc., Wage and Hour Employment Practices Litigation* (N.D.Cal. 2012) 289 F.R.D. 526, 538-539 [declining to certify off-the-clock claim asserting that employer's policies required employees to work before they clocked in because "there [was] no ʻcommon answer to the "why" [there was waiting time] question,'" and that answer was "particularly elusive in light of Defendant's official policy forbidding off-the-clock work"].)

Barriga argues the trial court's denial of certification is based on improper legal criteria. Specifically, she claims the trial court inappropriately evaluated the merits of her claims when deciding class treatment was not justified. While she is correct courts may not base certification decisions on whether the case will likely succeed on the merits, the trial court didn't do that here. (E.g., *Sav-On*, *supra*, 34 Cal.4th at p. 341 [likelihood of success on the merits is an "improper criteria"].) The court did not conclude Barriga *couldn't prove* some graveyard shift employees had to wait off the clock before leaving,

only that she would need a significant amount of individualized evidence *to prove* the claims.

On this record, the trial court reasonably could conclude Barriga failed to demonstrate off-the-clock waiting to leave was a widespread practice and was the rule, rather than an exception. The court also reasonably could conclude proving undercompensation would require individualized proof that particular employees waited, off the clock, to leave the store. Thus, were the disposition of this case up to me, I would have reviewed the ruling actually appealed on the grounds for finding error actually asserted by appellant and would have concluded the trial court's refusal to grant certification is supported by the record and based on proper legal criteria.[1] That is plainly what the majority are required to do by binding legal precedent, but they've chosen a different path.

## II

## THE MAJORITY MISINTERPRET
## AN UNCHALLENGED EVIDENTIARY RULING

Instead, the majority review the trial court's ruling on Barriga's motion to strike all 174 of 99 Cents' employee declarations (53 of which came from prospective class members, the remaining 121 came from employees who are not prospective class members). There are three serious problems with the majority's approach to this case.

---

[1] Because I find the court's predominance conclusion proper, it would be unnecessary to review the court's additional, independent conclusion regarding manageability.

13

First, they should not even be reviewing an evidentiary ruling that no party has challenged on appeal. The only time Barriga mentioned the ruling in her opening brief was to provide factual background for our review of the certification order. The majority should therefore take the approach commonly followed in any appeal, including appeals of class certification orders, and treat the issue as waived. (E.g., *Modaraei v. Action Property Management, Inc.* (2019) 40 Cal.App.5th 632, 636, fn. 5 ["Along with its order denying class certification, the trial court made a number of evidentiary rulings based on objections filed by both parties. Neither party has appealed the trial court's evidentiary rulings. "'As a result, any issues concerning the correctness of the trial court's evidentiary rulings have been waived.'""].)

The majority claim they can exercise their discretion to review the evidentiary ruling sua sponte under Code of Civil Procedure section 906, but that provision allows for review of only those interlocutory rulings that "*necessarily affect[ ]* the judgment or order appealed from." (Code Civ. Proc., § 906, italics added.) The majority make no attempt to explain how the ruling on the motion to strike affected the certification order— indeed, they explicitly refuse to "address the merits of the order denying plaintiff's class certification motion" and acknowledge they don't know whether the evidentiary ruling affected the outcome. (Maj. opn., *ante*, at pp. 5, fn. 2, 54.)

Second, in reviewing a ruling they shouldn't, the majority misinterpret the trial court's thorough and proper analysis. They fault the trial court for failing to "properly underst[an]d its duty to carefully review *all 174 declarations* for potential abuse, not just

14

the declarations from putative class members." (Maj. opn., *ante*, at p. 54.) But they get there only by misconstruing a single phrase from the court's two-page evidentiary ruling, and they completely ignore the fact that the ruling rests on an independent alternative ground.

The third problem relates to the first and is perhaps the most frustrating aspect of the majority opinion. Even if one accepts their interpretation of the trial court's evidentiary ruling, the error clearly had no effect on the court's decision to deny certification. The lack of prejudice is not just a reason not to review the ruling in the first place, it's also a reason not to reverse. (Cal. Const., art. VI, § 13; Evid. Code, § 353; Code Civ. Proc., § 475.) Any way you look at it, we should be affirming the trial court.

A.    *Background Facts*

Of the 174 employee declarants, 162 said they didn't have to wait after clocking out and could instead leave their store immediately. The remaining 12 said they occasionally had to wait for a door to be unlocked, but the wait was at most a couple minutes.

Barriga selected 12 of the declarants to cross-examine, and 99 Cents made them available for deposition. Of those deposed, eight confirmed their declaration testimony and said they were always able to leave their store immediately after clocking out. The remaining four said there were times when they had to wait a few minutes for the door to be unlocked, but those times were rare and brief, lasting only the short amount of time it took to walk across the store.

15

During the depositions, Barriga's counsel asked each employee whether they felt pressure to sign a declaration for their employer and whether they felt there would be negative consequences if they refused to do so. All of them said they didn't feel any pressure from the company to sign their declaration nor did they fear any negative consequences had they chosen not to.

When Barriga filed her reply in support of certification, she also filed a motion to strike all 174 declarations on the ground 99 Cents had obtained them through coercion. Citing *Gulf Oil Co. v. Bernard* (1981) 452 U.S. 89 (*Gulf Oil*), she argued the trial court has inherent authority to monitor the communications between the parties to a class action and can exercise control over those communications to ensure fairness in the litigation. (See *id.* at p. 100 [holding that "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties"].) She relied on *Quezada v. Schneider Logistics Transloading and Distrib.* (C.D.Cal., Mar. 25, 2013, No. cv 12-2188 CAS DTBx) 2013 WL 1296761 (*Quezada*), in which the federal district court surveyed case law applying *Gulf Oil* in the context of precertification employer-employee communications and concluded that precedent authorized it to strike employee declarations that the record clearly revealed were obtained through coercion and abuse of employer power.

In *Quezada*, the plaintiff had presented "*clear countervailing evidence* show[ing] that [the defendant employer's] communications with its employees were improper." (*Quezada*, *supra*, 2013 WL 1296761, at p. *5, italics added.) Specifically, the plaintiff

16

supplied evidence that the employer had called its employees in for interviews, lied about the purpose of the interviews (saying they were for an "internal investigation" only), then told them to sign a document it failed to disclose was a sworn declaration. (*Ibid.*)

Barriga argued 99 Cents' declaration-gathering process was similarly "coercive and deceptive" because the interviews and declaration signings occurred in store offices during working hours. Barriga argued that setting alone showed an abuse of employer power because there is a "heightened potential for coercion" in an employer-employee relationship.

99 Cents opposed the motion to strike. Recognizing the trial court has inherent authority to monitor party and potential party communications when exercising control over class litigation, the company argued there was no evidence it had employed any coercive tactics in obtaining declarations from its employees. It argued the fact the interviews and declaration signings occurred in store offices during working hours was insufficient to demonstrate coercion, absent other factors indicating abuse of power like those present in *Quezada*.

At the hearing on class certification the court also heard arguments on the motion to strike. The parties discussed, and the court agreed, that the authority to review the declarations for coercion or employer abuse was not statutory, but rather arose from its inherent power to ensure fairness in the cases before it. The parties argued over whether there was evidence of coercion like there had been in *Quezada*, and the court took the matter under submission.

17

A few months later, the court issued a lengthy written ruling denying both the motion to strike and the motion for certification. In its discussion of the motion to strike, the court described *Quezada* at length and distinguished it from the evidence in this case, concluding there was "no indication that anything even approximating such coercive behavior occurred here" and "no reason to think [99 Cents'] declaration-gathering process was in any way improper." It noted that Barriga had argued the setting of the interviews and declaration signings was a sufficient reason, on its own, to find coercion because the employment relationship is inherently fraught with the potential for power abuses. But the court rejected that argument, reasoning that there is "nothing inherently coercive" about a company interviewing employees in store during office hours "absent other factors suggesting coercion." It then explained why she found no other factors suggesting coercion and, on that basis, denied the motion to strike.

The majority review this ruling and conclude the court didn't understand the "scope" of its authority. Specifically, they conclude the court didn't understand "its duty to carefully review *all 174 declarations* for potential abuse, not just the declarations from putative class members." (Maj. opn., *ante*, at p. 54.) To appreciate how significantly this misconstrues the trial court's analysis, it's helpful to see what the court actually wrote:

"In the absence of [statutory] authority, Plaintiff relies on an unpublished federal district court decision, *Quezada v. Schneider Logistics Transloading and Distrib.* (C.D.Cal., Mar. 25, 2013, No. cv 12-2188 CAS DTBx) 2013 WL 1296761, in which the court struck a set of employee declarations pursuant to its inherent authority to monitor

18

'pre-certification communications with prospective members of the plaintiff class.' (*Id.* at p. *4.)

"Plaintiff has failed to establish that striking *any declarations* would be warranted under *Quezada*. In *Quezada*, the defendant employer 'failed to notify the employees of the nature and purpose of the communications' but 'instead misleadingly told [the employees] that the interviews were only an "internal investigation."' (2013 WL 1296761, at p. *5.) The employees were also 'not even told that the document they were asked to sign at the close of the interview was a sworn declaration.' (*Ibid.*) *There is no indication that anything even approximating such coercive behavior occurred here.* Defendant interviewed employees in store offices during business hours, but there is nothing inherently coercive about that setting (absent other factors suggesting coercion). Indeed, the declarants whom Plaintiff deposed testified that they never 'felt pressured to sign [a] declaration' and did not believe there would be any 'consequences' if they did not. [Record Citations.] Three considerations weighed particularly heavily in the *Quezada* analysis: 'whether the employer adequately informed the employees abou[t] (1) the details underlying the lawsuit, (2) the nature and purpose of the communications, and (3) the fact that any defense attorneys conducting the communications represent the employer and not the employee.' (2013 WL 1296761, at p. *4.) Tellingly, the language of the declarations in this case makes clear that declarants received each of these disclosures. [Record Citations.] The declarations stated, among other things, that 'a lawsuit has been filed against the Company by a former employee' about how the

19

company records time and pays wages during graveyard shifts; that 'the former employee wants her case to be a class action, which means she wants to represent other 99 Cents Only employees in addition to herself' and that 'it is possible that I will be included as part of the class action'; that 'this declaration may be used by the Company to defend itself against the lawsuit'; and that 'the Company representative who has helped me prepare this declaration is working on behalf of the Company and not me personally." (*Ibid.*) There is no reason to think that Defendant's declaration-gathering process was in any way improper. And *even if there were* such evidence, *Quezada* would not justify striking declarations of employees who are not prospective class members (121 of Defendant's 174 declarations)." (Italics added.)

B.    *The Majority Misinterpret a Counterfactual Line of Reasoning*

To support their conclusion the court didn't review or realize it could strike all of the declarations, the majority cite the second half of the final sentence of the ruling, where the court says that even if it had found evidence of coercion, "*Quezada* would not justify striking declarations of employees who are not prospective class members." The flaw is obvious. The majority either ignores or misses the fact this was an alternative ground for refusing to strike the declarations, based on the assumption that the employer *had* (contrary to fact) coerced its employees. The court was explaining that "even if there were" evidence of coercion—and it had just thoroughly discussed why there wasn't—the holding of *Quezada* did not apply to employees who were not prospective class members. This is a correct description of *Quezada's* holding, not affirmative evidence the court

didn't review all the declarations. It's clear not just from the sentence itself but also from the rest of the ruling that this was at most an *alternative basis of the court's ruling*. The basis for the trial court's ruling in the preceding two pages of analysis stands independently, and in it the court explains why none of the declarations bears the indicia of coercion.

When the reason for a trial court's decision is unclear we must indulge all "presumptions . . . to support it . . . and error must be affirmatively shown." (*People v. Giordano* (2007) 42 Cal.4th 644, 666.) "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

But this isn't even a case where the presumption of correctness comes into play. This is not a silent record where we're left wondering the reasons to support the trial court's ruling. The trial court gave the reasons to us—it reviewed all of the circumstances surrounding how 99 Cents obtained each employee declaration and concluded there was no evidence of coercion. The court affirmatively stated Barriga had "failed to establish that striking *any declarations* would be warranted under *Quezada*" and the record contained no evidence "that Defendant's declaration-gathering process was *in any way improper*." (Italics added.) In concluding the court didn't review or realize it could strike

21

121 of the declarations, the majority do the opposite of what appellate courts are required to do on review. They ignore the statements the trial court made and presume a misunderstanding that doesn't exist. I do not say this lightly, but I don't think I've ever seen such an obvious misreading of such a clear trial court ruling.

I am also troubled by the majority's statement that "it is not entirely clear the court scrutinized the declarations from the perspective that communications between a class opponent and its current employees are fraught with potential abuse." (Maj. opn., *ante*, at p. 50.) Although this statement is not part of their holding, it serves as additional evidence they have reviewed the ruling from a place of skepticism, as opposed to presumed accuracy. Plus, I'm not sure I understand what my colleagues mean by the statement. Are they really saying they don't think the trial court understood the inherent power imbalance between an employer and an employee? Of course it understood that basic, obvious reality. It spent the first part of its ruling discussing *Quezada*, a case dealing with precisely that topic—potential power abuses in the employment setting— then spent the second part of its ruling explaining why it found no evidence the potential for abuse was actualized in this case.

The trial court's analysis was far from novel. In deciding whether to grant class status, courts are required to review the allegations in the pleadings and any declaration testimony submitted. (See, e.g., *Brinker*, *supra*, 53 Cal.4th at pp. 1020-1022 ["Brinker submitted hundreds of declarations in support of its opposition to class certification. [¶] . . . [¶] A court *must examine* the allegations of the complaint and *supporting*

22

*declarations*"], italics added.) In conjunction with this requirement, courts are routinely called upon to determine whether the plaintiff has shown the necessary compelling evidence of coercion to justify striking any of the employer-obtained declarations. (See, e.g., *Maddock v. KB Homes, Inc.* (C.D.Cal. 2007) 248 F.R.D. 229, 237 [denying request to strike employee declarations where "no evidence to suggest that defendant engaged in any misleading or coercive communications"]; *Javine v. San Luis Ambulance Serv., Inc.* (C.D.Cal. Dec. 12, 2014, No. cv 13-07480 BRO (SSx)) 2014 WL 12496988, at p. *4 [same, comparing record to *Quezada* and finding inadequate showing of improper communication]; *Delbridge v. Kmart Corp.* (N.D.Cal. June 11, 2013, No. C 11-02575 WHA) 2013 WL 2605513, at pp. *5, *7 [same, concluding plaintiff made inadequate showing that the declarations were "fundamentally coercive or misleading"].)

It's hard to imagine what more the court could have written to convince my colleagues that it had indeed reviewed the entirety of 99 Cents' declaration-gathering process and understood employment relationships carry a potential for abuse. What would have made them "entirely" sure it was exercising its discretion properly? Were they looking for the magic words "communications between a class opponent and its current employees are fraught with potential abuse"? (Maj. opn., *ante*, at p. 50.) If so, they weren't going to find them because instead of focusing on *potential* abuse, the court focused on whether there was evidence of *actual* abuse in how 99 Cents obtained any of the declarations. It found none, and that conclusion finds ample support in this record.

The majority opinion is a textbook example of why reviewing courts must assume trial courts understand the applicable law unless there is affirmative evidence of a misunderstanding. Trial judges reading today's opinion should rightfully be worried. Will they include the right buzzwords in their next ruling? Will they find the right arrangement of legal terms to satisfy the reviewing court that they understand the law they're applying? If they don't, will all their work and the work of the parties go out the window? This case suggests the answer is it might.

The majority opinion is also a perfect example of why we shouldn't go looking in the record for unchallenged rulings to review. (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4 ["An appellant's failure to raise an argument in the opening brief waives the issue on appeal"].) Even Barriga, the party with the incentive to challenge the evidentiary ruling, did not do so. I have to assume that's because she couldn't find anything wrong with it.

At oral argument and in its supplemental briefing, counsel for 99 Cents respectfully pointed out the places in the trial court's ruling that clearly show it had reviewed the entire declaration-gathering process for coercion. But instead of addressing this argument in substance, my colleagues chose to reprimand the company for attaching a transcript of the oral argument webcast to its brief, noting that our court does not officially transcribe our oral arguments and they "are aware of no authority that supports a party privately transcribing oral argument and filing a transcript with the court." (Maj. opn., *ante*, at p. 28, fn. 10.) But the whole point of oral argument is to provide the parties

with an opportunity to present their views of the case, and the majority's protestations about transcripts is a distraction and a pretext for refusing to engage with 99 Cents' arguments on the merits. Think about the import of their position. The Court of Appeal may choose to ignore the arguments you make at oral argument if you transcribe them and submit them as an aid to the court with invited supplemental briefs. There is no world in which that's a reasonable position.

This brings me to the final problem with the majority's treatment of what could have been a simple affirmance. They conclude the court's purported abuse of discretion means they "need not address the merits of the order denying plaintiff's class certification motion." (Maj. opn., *ante*, at p. 5, fn. 2.) Purporting to apply the standard of review applicable to class certification orders, they conclude the evidentiary ruling was "based on incorrect legal assumptions." (*Id.* at p. 52.) This leads them to further conclude there is "no valid reason" for the certification order. (*Id.* at p. 53.)

First of all, that's the wrong standard. It applies to a review of a certification order, not *an evidentiary ruling* which is what the majority chose to review in this appeal. We review evidentiary rulings for prejudicial abuse of discretion. (E.g., *ABM Industries*, *supra*, 19 Cal.App.5th at p. 293; see also *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 515 [citing Evid. Code, § 352 and concluding "no prejudice resulted from this incorrect ruling because the underlying evidence, as well as the putative class representatives' argument, . . . were before the court and considered by it" in its

25

certification analysis]; *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 [same].)

Evidence Code section 353 states that a judgment or decision of the trial court may not be reversed "by reason of the erroneous admission of evidence unless: [¶]. . . [¶] [t]he court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of *resulted in a miscarriage of justice*." (Italics added.)

Code of Civil Procedure section 475 states that we "must, in every stage of an action, disregard any error, improper ruling, instruction, or defect . . . in the opinion of [the trial] court, [if it] *does not affect the substantial rights of the parties*. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect *was prejudicial*, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, *and that a different result would have been probable* if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." (Italics added.)

But even if one applies the wrong standard of review as the majority propose, an order granting or denying class certification may be reversed only if it is *based on* improper legal criteria (such as the lawsuit's likelihood of success on the merits). (*Sav-On*, *supra*, 34 Cal.4th at p. 341.) The standard itself makes clear that reversing a

26

certification order based on an error *in an evidentiary ruling* is proper only if the reviewing court concludes the certification order was *based on* the evidentiary error. "A certification decision is reviewed for abuse of discretion, but when the *supporting reasoning* reveals the court *based its decision* on erroneous legal assumptions about the relevant questions, that decision cannot stand." (*Ayala*, *supra*, 59 Cal.4th at p. 537, italics added; see also *Linder*, *supra*, 23 Cal.4th 429 at p. 436 [before reversing a certification order as based on erroneous legal assumptions, "we must examine the trial court's reasons for denying class certification"].)

In other words, the prejudice requirement does not go away in potential class litigation. It is a constitutional mandate, binding on this court. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . in any cause, on the ground of . . . the improper admission or rejection of evidence . . . or for any error as to any matter of procedure, unless, *after an examination of the entire cause*, including the evidence, the court shall be of the opinion that *the error complained of has resulted in a miscarriage of justice*"], italics added.) If anything, the need for a prejudice analysis is even greater in potential class litigation because of the vast resources expended in litigating such cases.

The majority's attempt to rely on *Ayala* for their refusal to conduct a prejudice analysis serves only to broadcast their error. In *Ayala*, the appellant challenged, *and our Supreme Court reviewed*, the trial court's order denying class certification. The case did not involve an additional evidentiary ruling as ours does. In concluding the certification order was based on an improper legal assumption (and was therefore reversible), the

27

Court held the trial court had applied the wrong employment relationship test in concluding individual issues would predominate the determination of whether plaintiffs were employees or independent contractors. (*Ayala*, *supra*, 59 Cal.4th at p. 528 ["Because the trial court *principally rejected* certification *based* not on differences in [the defendant company's] right to exercise control, but on variations in how that right was exercised, its decision cannot stand"], italics added.)

The majority claim to be straightforwardly applying *Ayala*, but they have not performed the necessary step of determining whether the certification order was based on the evidentiary error they identify. Their argument goes like this: Because *Ayala* found the certification order was based on an erroneous legal assumption and did not proceed to analyze whether that error prejudiced the certification order, we are required to forgo a prejudice analysis in this case. (Maj. opn., *ante*, at p. 54.) Then, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 like a talisman to ward off critical thought, they conclude that because "[t]he [*Ayala*] court did not say [a certification order] cannot stand *unless the error is harmless*" appellate courts are bound by that rule "[u]ntil the court says otherwise." (Maj. opn., *ante*, at p. 54.)

The majority's reasoning boils down to: If our Supreme Court has not explicitly said we can't do something, then we must do it until the Court holds otherwise. Nonsense. The reason *Ayala* does not contain a prejudice analysis is because the Court wasn't reviewing *an evidentiary ruling*. (*Ayala*, *supra*, 59 Cal.4th at p. 537.) But *Ayala*

*does contain* an analysis of whether the erroneous legal assumption the Court identified actually affected the certification order—something my colleagues refuse to analyze.

The other case the majority rely on, *City of Desert Hot Springs v. Valenti* (2019) 43 Cal.App.5th 788, 795, is completely irrelevant. (Maj. opn., *ante*, at pp. 53-54.) In *Valenti*, we found the trial court abused its discretion in issuing *the order the appellant challenged on appeal* (specifically, an order denying the appellant's request for appointment of a receiver). (*Valenti*, at p. 792.) *Valenti* involved neither a class certification order nor an evidentiary ruling. (*Ibid*.) In other words, our review was confined to one appealed order and involved a straightforward application of appellate principles. The case provides no basis for the majority to bypass a prejudice analysis here.

If the majority *had* considered whether the purported evidentiary error prejudiced the outcome of this case, they would unquestionably have to conclude it did not. This is because the trial court's decision to deny certification was not based on anything in the 121 declarations from nonclass members. Rather, the decision rested on the conclusion that Barriga's proposed common proof of widespread off-the-clock waiting was insufficient. The court reached that conclusion by analyzing 99 Cents' nighttime security policy and other off-the-clock cases with similar policies and concluding the policy did not necessarily result in off-the-clock waiting. The court also relied on the deposition testimony of the 99 Cents employees explaining the various reasons why they could leave immediately after clocking out based on the layout and operations of their stores. Simply

put, the court's certification decision rested on 99 Cents' policy and the deposition testimony of its employees, not on the content of the 121 nonclass member declarations.

The majority's error has serious practical consequences. By remanding and directing the trial court to reconsider Barriga's motion to strike and the certification motion, the majority waste the court's and the parties' time and resources. Remand is futile for two reasons. First, because the trial court has *already explained* why it found no evidence of coercion in any aspect of 99 Cents' declaration-gathering process, remand will simply force the court to make the same ruling a second time. The only evidence of coercion that Barriga presented was that 99 Cents interviewed the employees and obtained the declarations in store offices during business hours.

*No court has ever held that setting, on its own, constitutes the clear evidence of improper conduct required to strike a declaration.* If the majority have concluded otherwise, they should clearly say so as it would mark a watershed moment in the application of *Gulf Oil* and its progeny. (See, e.g., *Casida v. Sears Holdings Corp.* (E.D.Cal. Aug. 8, 2012, No. 1:11-cv-01052 AWI) 2012 WL 3260423, at p. *6 [denying request to strike employee declarations and rejecting argument that such declarations are "inherently suspect"]; *Javine v. San Luis Ambulance Serv., Inc.*, *supra*, 2014 WL 12496988, at p. *4 [same, comparing record to *Quezada* and finding inadequate showing of coercion or abuse of power]; *Delbridge v. Kmart Corp.*, *supra*, 2013 WL 2605513, at pp. *5, *7 [same, concluding the plaintiff had made an inadequate showing that the declarations were "fundamentally coercive or misleading"]; cf. *Pike v. Cty. of San

*Bernardino* (C.D.Cal. Aug. 9, 2018, No. EDCV 17-01680 JGB (KKx)) 2018 WL 6521576, at p. *2 [rejecting limit on employer communication with employees where no "coercion, intimidation, or otherwise improper contact"]; *Parks v. Eastwood Ins. Servs., Inc.* (C.D.Cal. 2002) 235 F.Supp.2d 1082, 1084 [same, where no evidence of specific abuse or misconduct]; *Babbitt v. Albertson's Inc.* (N.D.Cal. Jan. 28, 1993, No. C-92-1883 SBA (PJH)) 1993 WL 128089, at p. *8 [same, where no evidence of "specific abuses"].)

Second, remand is futile because no matter how the court ends up ruling on its reconsideration of Barriga's motion to strike, the ruling won't affect the certification analysis. Whether or not the court strikes the 121 nonclass member declarations will not alter its conclusion that Barriga cannot demonstrate routine off-the-clock waiting with common evidence. (See *People v. Seldomridge* (1984) 154 Cal.App.3d 362, 365 [we will not reverse for further proceedings when to do so would be "a useless and futile act and would be of no benefit to appellant"; see also *Lindeleaf v. Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 876 [refusing to remand for futile act]; *Charles H. Duell, Inc. v. Metro-Goldwyn-Mayer Corp.* (1932) 128 Cal.App. 376, 385 ["it remains a rule of appellate procedure that a reviewing court will not remand a case where further proceedings therein would be futile"].)

Remand will unnecessarily prolong a case that has already languished too long on review. This is unfair not only to 99 Cents who successfully opposed class certification but also to Barriga and other potentially similarly situated employees who deserve finality so they can decide whether to proceed against 99 Cents individually.

Today's opinion purports to establish a binding rule on class action disputes with devastating consequences to trial courts and litigants. For the reasons discussed above, I would affirm.

SLOUGH            <br>J.